# SECOND ORIGINAL

No. __00A09430-6__

Date Summons Issued and Filed

__6/30/09__

_____
Deputy Clerk

Deposit Paid $ __85.50__

[ ]    **ANSWER**

[ ]    **JURY**

## STATE COURT OF DEKALB COUNTY
### GEORGIA, DEKALB COUNTY

#### SUMMONS

PHILIP A. MARSDEN, DONALD R. MILLARD, HOPPY ENTERPRISES, LLC,
MARSHALL B. HUNT, OLIN GARWOOD LIPPINCOTT and PWP
_____
INVESTMENTS, LLC
_____
(Plaintiff's name and address)

vs.

BRANDYWINE HEALTH SERVICES OF MISSISSIPPI, INC., d/b/a
_____
CHOCTAW COUNTY MEDICAL CENTER and JEFFREY A. MORSE
_____

_____
(Defendant's name and address)

**TO THE ABOVE-NAMED DEFENDANT:**

You are hereby summoned and required to file with the Clerk of State Court, Room 104, DeKalb County Courthouse, 556
N. McDonough Street, Decatur, Georgia 30030 and serve upon the plaintiff's attorney, to wit:

William C. Collins, Jr., Esq., Burr & Forman, LLP
_____
(Name)
171 Seventeenth Street, NW, Suite 1100, Atlanta, Georgia 30363
_____
(Address)
(404) 815-3000                  178847
_____
(Phone Number)                 (Georgia Bar No.)

an **ANSWER** to the complaint which is herewith served upon you, within thirty (30) days after service upon you, exclusive of the day
of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. (Plus cost of
this action.)

_____
Defendant's Attorney                         Third Party Attorney

_____
Address                                    Address

_____
Phone No.      Georgia Bar No.               Phone No.          Georgia Bar No.

### TYPE OF SUIT

[X] Account      [ ] Personal Injury      Principal    $ _____
[ ] Contract     [ ] Medical Malpractice
[ ] Note        [ ] Legal Malpractice      Interest     $ _____
[ ] Trover      [ ] Product Liability
             [ ] Other                  Atty Fees   $ _____

[ ] Transferred From _____

**(Attach BLUE to Original and WHITE to Service Copy of complaint)**

summons1-2007rev

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

PHILIP A. MARSDEN, DONALD R.                )
MILLARD, HOPPY ENTERPRISES, LLC,            )
MARSHALL B. HUNT, OLIN GARWOOD              )
LIPPINCOTT and PWP INVESTMENTS, LLC,        )
                                            )
        Plaintiffs,                              )
                                            )
                                            )    CIVIL ACTION
v.                                          )    FILE NO.
                                            )
BRANDYWINE HEALTH SERVICES OF               )
MISSISSIPPI, INC., d/b/a CHOCTAW            )
COUNTY MEDICAL CENTER and JEFFREY           )
A. MORSE,                                   )
                                            )
        Defendants.                              )

## COMPLAINT

COME NOW Plaintiffs Philip A. Marsden ("Marsden"), Donald R. Millard ("Millard"),

Hoppy Enterprises, LLC ("Hoppy"), Marshall B. Hunt ("Hunt"), Olin Garwood Lippincott

("Lippincott") and PWP Investments, LLC ("PWP"), and file the following as their Complaint

against Defendants Brandywine Health Services of Mississippi, Inc., d/b/a Choctaw County

Medical Center ("Brandywine") and Jeffrey A Morse ("Morse"):

1.

Defendant Brandywine is a Mississippi corporation. It can be served by delivery of a

second original summons and complaint to Brandywine's registered agent for service, J. Richard

Barry, at 505 Constitution Ave., Meridian MS 39302, or through any other means provided by

law. As detailed herein, Brandywine has transacted the business within the State of Georgia,

including the business forming the subject of this action, and is therefore subject to personal

jurisdiction in Georgia courts pursuant to the Georgia Long Arm Statute. Brandywine has also contractually consented to the jurisdiction and venue of this Court.

2.

Defendant Morse is a resident of the State of Maryland. Morse has transacted business within the State of Georgia, including the business forming the subject of this action, and is therefore subject to jurisdiction in Georgia courts pursuant to the Georgia Long Arm Statute. Additionally, Morse has contractually consented to the jurisdiction and venue of this Court.

3.

On or about March 26, 2007, Plaintiffs and Brandywine entered into a Loan Agreement ("Loan Agreement") providing, *inter alia*, for the following:

(a)     Plaintiffs would collectively make a commercial loan to Brandywine in the aggregate amount of between $100,000 and $1,000,000, to be used by Brandywine for general corporate purposes, including the partial payment of an IRS payroll tax liability;

(b)     The loan would be evidenced by one or more notes;

(c)     As partial consideration for making the loan, Brandywine would issue to Plaintiffs warrants to purchase common stock of Brandywine.

A true and correct copy of the Loan Agreement is attached hereto as Exhibit "A".

4.

Pursuant to the terms of the Loan Agreement, Brandywine executed and delivered a Warrant to Purchase Common Stock dated March 26, 2007, to each of the Plaintiffs (collectively, the "Warrant Agreements"). The Warrant Agreements are identical in form and provide, *inter alia*, for the following:

(a)     The holder of the Warrant Agreement is entitled to purchase a defined number of shares of Brandywine's common stock at a defined price, and the warrant could be exercised at any time before March 26, 2012;

(b)     In lieu of exercising the warrant, the holder can elect to exercise the Minimum Payment Option contained in the Warrant Agreement and receive a cash payment (the "Minimum Payment Option Amount") from Brandywine equal to $25,000 for each $50,000 advanced by the holder to Brandywine pursuant to the Loan Agreement;

(c)     The Minimum Payment Option can be exercised by the holder at any time on or after April 1, 2009, by providing written notice to Brandywine of the holder's election to exercise the option.

True and correct copies of the Warrant Agreements are attached hereto as Exhibits "B" through "G".

5.

On December 20, 2007, Brandywine and Plaintiffs entered into an Amendment Agreement (the "First Amendment") amending the Loan Agreement in certain respects, including without limitation the following:

(a)     Upon Brandywine's second failure to make payments due under the Loan Agreement existing for more than 25 days (or any failure to make payment existing for more than 90 days), the Minimum Payment Option Amount under the Warrant Agreements shall be increased by 200%;

(b)     Brandywine agreed to pay certain legal expenses of Plaintiffs in connection with the preparation of the original loan documents; and

(c)     Payment terms of the Notes were modified.

3

6.

In connection with the First Amendment and as an inducement therefor, Defendant Morse executed and delivered a Guaranty in favor of Plaintiffs, dated December 20, 2007 (the "Guaranty"), pursuant to which Morse unconditionally guaranteed the full and punctual payment of all amounts owed by Brandywine to Plaintiffs under any and all of the loan documents, including without limitation the Warrant Agreements. A true and correct copy of the Guaranty is attached hereto as Exhibit "H".

7.

The amounts advanced by Plaintiffs to Defendant pursuant to the Loan Agreement are as follows:

Philip A. Marsden -- $150,000;

Donald R. Millard -- $100,000;

Hoppy Enterprises, LLC -- $200,000;

Marshall B. Hunt -- $100,000;

Olin Garwood Lippincott -- $75,000; and

PWP Investments, LLC -- $25,000.

8.

By letters to Brandywine dated April 1, 2009, Plaintiffs elected the Minimum Payment Options under their respective Warrant Agreements and demanded payment of the Minimum Option Payment Amounts within the 30-day period required under the Warrant Agreements. Brandywine received those notices no later than April 2, 2009, making the payments due no later than May 2, 2009. As of the date of this Complaint, Brandywine has failed to pay the Minimum Payment Option Amounts to Plaintiffs.

9.

More than 25 days have passed since the Minimum Option Payment Amounts became due and owing, and said payments have still not been made. Brandywine's failure to pay the Minimum Payment Option Amounts, when due constitutes Brandywine's second late payment and, pursuant to the First Amendment, results in a 200% increase in the Minimum Payment Option Amounts. Brandywine is therefore indebted to Plaintiffs in the following amounts:

$225,000 owed to Philip A. Marsden

$150,000 owed to Donald R. Millard;

$300,000 owed to Hoppy Enterprises, LLC;

$150,000 owed to Marshall B. Hunt;

$112,500 owed to Olin Garwood Lippincott; and

$37,500 owed to PWP Investments, LLC.

10.

Plaintiffs have made a demand upon Defendant Morse, as guarantor of Brandywine's payment under the Warrant Agreements, for payment in full of the amounts owed, and Morse has failed to pay said amounts. Plaintiffs again demand that Morse pay all amounts owed to Plaintiffs under the Warrant Agreements.

11.

As a part of the Loan Agreement, Brandywine agreed to pay all reasonable attorney's fees incurred by Plaintiffs in the collection of any indebtedness arising under the terms of the Loan Agreement. Pursuant to O.C.G.A. §13-1-11, Plaintiffs hereby give written notice to Defendants of Plaintiffs' intention to enforce the provisions in the Loan Agreement relative to attorney's fees, and Defendants have ten days from their respective receipt of this Complaint to pay the total amounts owed under the Warrant Agreements, as set forth herein in paragraph 9

hereof, and avoid liability for attorney's fees. If, but only if, Defendants fail to pay the amounts owed within such time, they will be liable to Plaintiffs for attorney's fees in the amounts allowed under O.C.G.A. § 13-1-11.

## COUNT I BREACH OF CONTRACT

### (PLAINTIFF MARSDEN AGAINST BRANDYWINE)

12.

Plaintiffs reallege and incorporate by reference herein the allegations contained in paragraph 1 through 11 above.

13.

By failing to pay the amounts due thereunder, Brandywine has breached the Warrant Agreement in favor of Marsden, as well as the Loan Agreement, and is therefore liable to Marsden in the amount of $225,000, plus reasonable attorney's fees pursuant to O.C.G.A. § 13-1-11 of $22,500, plus pre-judgment interest at the statutory rate.

## COUNT II BREACH OF CONTRACT

### (PLAINTIFF MILLARD AGAINST BRANDYWINE)

14.

Plaintiffs reallege and incorporate by reference herein the allegations contained in paragraph 1 through 13 above.

15.

By failing to pay the amounts due thereunder, Brandywine has breached the Warrant Agreement in favor of Millard, as well as the Loan Agreement, and is therefore liable to Millard

in the amount of $150,000, plus reasonable attorney's fees pursuant to O.C.G.A. §13-1-11 of $15,000, plus pre-judgment interest at the statutory rate.

## COUNT III BREACH OF CONTRACT

### (PLAINTIFF HOPPY AGAINST BRANDYWINE)

16.

Plaintiffs reallege and incorporate by reference herein the allegations contained in paragraph 1 through 15 above.

17.

By failing to pay the amounts due thereunder, Brandywine has breached the Warrant Agreement in favor of Hoppy, as well as the Loan Agreement, and is therefore liable to Hoppy in the amount of $300,000, plus reasonable attorney's fees pursuant to O.C.G.A. §13-1-11 of $30,000, plus pre-judgment interest at the statutory rate.

## COUNT IV BREACH OF CONTRACT

### (PLAINTIFF HUNT AGAINST BRANDYWINE)

18.

Plaintiffs reallege and incorporate by reference herein the allegations contained in paragraph 1 through 17 above.

19.

By failing to pay the amounts due thereunder, Brandywine has breached the Warrant Agreement in favor of Hunt, as well as the Loan Agreement, and is therefore liable to Hunt in the

amount of $150,000, plus reasonable attorney's fees pursuant to O.C.G.A. §13-1-11 of $15,000,

plus pre-judgment interest at the statutory rate.

## COUNT V  BREACH OF CONTRACT
### (PLAINTIFF LIPPINCOTT AGAINST BRANDYWINE)

20.

Plaintiffs reallege and incorporate by reference herein the allegations contained in

paragraph 1 through 19 above.

21.

By failing to pay the amounts due thereunder, Brandywine has breached the Warrant

Agreement in favor of Lippincott, as well as the Loan Agreement, and is therefore liable to

Lippincott in the amount of $112,500, plus reasonable attorney's fees pursuant to O.C.G.A. §13-

1-11 of $11,250, plus pre-judgment interest at the statutory rate.

## COUNT VI  BREACH OF CONTRACT
### (PLAINTIFF PWP AGAINST BRANDYWINE)

22.

Plaintiffs reallege and incorporate by reference herein the allegations contained in

paragraph 1 through 21 above.

23.

By failing to pay the amounts due thereunder, Brandywine has breached the Warrant

Agreement in favor of PWP, as well as the Loan Agreement, and is therefore liable to PWP in

the amount of $37,500, plus reasonable attorney's fees pursuant to O.C.G.A. §13-1-11 of $3,750,

plus pre-judgment interest at the statutory rate.

## COUNT VII  BREACH OF GUARANTY
### (PLAINTIFF MARSDEN AGAINST MORSE)

24.

Plaintiffs reallege and incorporate by reference herein the allegations contained in paragraph 1 through 23 above.

25.

By failing to pay the indebtedness of Brandywine under the Loan Agreement and Warrant Agreements upon demand by Plaintiffs, Defendant Morse has breached the Guaranty and is liable to Plaintiff Marsden in the amount of $225,000, plus reasonable attorney's fees pursuant to O.C.G.A. § 13-1-11 of $22,500, plus pre-judgment interest at the statutory rate.

## COUNT VIII  BREACH OF GUARANTY
### (PLAINTIFF MILLARD AGAINST MORSE)

26.

Plaintiffs reallege and incorporate by reference herein the allegations contained in paragraph 1 through 25 above.

27.

By failing to pay the indebtedness of Brandywine under the Loan Agreement and Warrant Agreements upon demand by Plaintiffs, Defendant Morse has breached the Guaranty and is liable to Plaintiff Millard in the amount of $150,000, plus reasonable attorney's fees pursuant to O.C.G.A. §13-1-11 of $15,000, plus pre-judgment interest at the statutory rate.

9

## COUNT IX  BREACH OF GUARANTY
### (PLAINTIFF HOPPY AGAINST MORSE)

28.

Plaintiffs reallege and incorporate by reference herein the allegations contained in paragraph 1 through 27 above.

29.

By failing to pay the indebtedness of Brandywine under the Loan Agreement and Warrant Agreements upon demand by Plaintiffs, Defendant Morse has breached the Guaranty and is liable to Plaintiff Hoppy in the amount of $300,000, plus reasonable attorney's fees pursuant to O.C.G.A. §13-1-11 of $30,000, plus pre-judgment interest at the statutory rate.

## COUNT X  BREACH OF GUARANTY
### (PLAINTIFF HUNT AGAINST MORSE)

30.

Plaintiffs reallege and incorporate by reference herein the allegations contained in paragraph 1 through 29 above.

31.

By failing to pay the indebtedness of Brandywine under the Loan Agreement and Warrant Agreements upon demand by Plaintiffs, Defendant Morse has breached the Guaranty and is liable to Plaintiff Hunt in the amount of $150,000, plus reasonable attorney's fees pursuant to O.C.G.A. §13-1-11 of $15,000, plus pre-judgment interest at the statutory rate.

## COUNT XI  BREACH OF GUARANTY
### (PLAINTIFF LIPPINCOTT AGAINST MORSE)

32.

Plaintiffs reallege and incorporate by reference herein the allegations contained in paragraph 1 through 31 above.

33.

By failing to pay the indebtedness of Brandywine under the Loan Agreement and Warrant Agreements upon demand by Plaintiffs, Defendant Morse has breached the Guaranty and is liable to Plaintiff Lippincott in the amount of 112,500, plus reasonable attorney's fees pursuant to O.C.G.A. §13-1-11 of $11,250, plus pre-judgment interest at the statutory rate.

## COUNT XII  BREACH OF GUARANTY
### (PLAINTIFF PWP INVESTMENTS, LLC AGAINST MORSE)

34.

Plaintiffs reallege and incorporate by reference herein the allegations contained in paragraph 1 through 33 above.

35.

By failing to pay the indebtedness of Brandywine under the Loan Agreement and Warrant Agreements upon demand by Plaintiffs, Defendant Morse has breached the Guaranty and is liable to Plaintiff PWP in the amount of $37,500, plus reasonable attorney's fees pursuant to O.C.G.A. §13-1-11 of $3,750, plus pre-judgment interest at the statutory rate.

## COUNT XIII EXPENSES OF LITIGATION

36.

Plaintiffs reallege and incorporate by reference herein the allegations contained in paragraph 1 through 35 above.

37.

Defendants have been stubbornly litigious and have caused Plaintiffs unnecessary trouble and expense and are therefore jointly and severally liable to Plaintiffs for Plaintiff's attorney's fees and other expenses of litigation actually incurred in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully pray for the following relief:

(a)     That process issue and be served upon Defendants as provided by law;

(b)     That Plaintiff Marsden be awarded a judgment in the amount of $225,000, plus interest and attorney's fees, against Brandywine and Morse, jointly and severally;

(c)     That Plaintiff Millard be awarded a judgment in the amount of $150,000, plus interest and attorney's fees, against Brandywine and Morse, jointly and severally;

(d)     That Plaintiff Hoppy be awarded a judgment in the amount of $300,000, plus interest and attorney's fees, against Brandywine and Morse, jointly and severally;

(e)     That Plaintiff Hunt be awarded a judgment in the amount of $150,000, plus interest and attorney's fees, against Brandywine and Morse, jointly and severally;

(f)     That Plaintiff Lippincott be awarded a judgment in the amount of $112,500, plus interest and attorney's fees, against Brandywine and Morse, jointly and severally;

(g)     That Plaintiff PWP Investments, LLC, be awarded a judgment in the amount of $37,500, plus interest and attorney's fees, against Brandywine and Morse, jointly and severally;

(h)     That Plaintiff be awarded its expenses of litigation actually incurred; and

(i)     That Plaintiffs have such other and further relief as this Court deems just in the circumstances.

This _24th_ day of ___June___ , 2009.


_____
William C. Collins, Jr.
Georgia Bar No. 178847
John Michael Kearns
Georgia Bar No. 142438
Attorneys for Plaintiffs
PHILIP A. MARSDEN, DONALD R. MILLARD, HOPPY
ENTERPRISES, LLC, MARSHALL B. HUNT, OLIN GARWOOD
LIPPINCOTT AND PWP INVESTMENTS, LLC

BURR & FORMAN LLP
Suite 1100
171 17th Street, N.W.
Atlanta, Georgia  30363
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

## LOAN AGREEMENT

This Loan Agreement is made and entered into this 26th day of March 2007, by and between Brandywine Health Services of Mississippi, Inc. d/b/a Choctaw County Medical Center (and Nursing Home) {the "Borrower"} and the lenders (the "Lenders") listed on the signature page.

## BACKGROUND

WHEREAS, the Borrower has requested that the Lenders loan to the Borrower a minimum of $100,000 and a maximum of $1,000,000 in the form of term loans (the "Term Loan") to finance certain general corporate purposes, including the partial payment of certain IRS payroll tax liabilities, which sums are to be evidenced by certain Term Note or Term Notes to be executed by the Borrower in favor of the Lenders in conjunction herewith (as amended from time to time the "Term Note" or "Term Notes"); and

WHEREAS, the Lenders are willing to loan the Borrower the sums requested, on the terms and subject to the conditions set forth herein and in the other Loan Documents (as hereinafter defined).

NOW, THEREFORE, the parties agree as follows:

1.      The Term Loan

(a) Term Loan Commitment. Upon the terms and subject to the conditions set forth in this Agreement, the Lenders severally agree to make advances for general corporate purposes on or before February 28, 2007, including the partial payment of an IRS payroll tax liability, in a minimum amount of $100,000 for all Lenders in the aggregate and a maximum amount of $1,000,000 for all Lenders in the aggregate, with $25,000 representing the smallest individual Term Note amount.

(b) Promissory Notes. The Term Loan shall be evidenced by one or more Term Notes in the form of Exhibit A attached hereto.

(c) Interest. The rate of interest on the Term Loan shall be 12% per annum based upon a 360-day year. Interest shall be paid monthly until the Term Notes are paid in full.

(d) Warrants. As partial consideration for making loans, Borrower will grant Lenders warrants to purchase common stock in accordance with the terms set forth in the Warrant Agreement.

(e) Payment Default Consideration. If the Borrower incurs a default in payment of any amount due hereunder of more than ten (10) days past the payment due date (a "Payment Default"), the rate of interest will increase by 3%, retroactive to the payment due date, for so long as the Payment Default is continuing.



Upon the occurrence of a Payment Default, and so long as the payment default is continuing, all loans and debt obligations due Jeffrey A. Morse, including to any family members and/or controlled entities, shall become subordinated to all payment obligations due hereunder.

(f) Payment. The Borrower may at any time prepay the indebtedness evidenced by a Term Note in an amount pro rata to all such term notes by paying the principal, interest, and any other amounts due hereunder without penalty.

(g) Principal Payments. The principal amount of each Term Note shall be repaid at the time set forth in such Term Note.

2.    Representations and Warranties. In order to induce the Lenders to enter into this Agreement and to make the Term Loan, the Borrower represents and warrants to the Lenders (which representations and warranties shall survive the delivery of the Term Notes and the making of the Term Loan) that:

(a) Corporate Status. The Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Mississippi, has the corporate power and legal authority to own its property and carry on its business as now being conducted, and is duly qualified to do business in every jurisdiction where such qualification is necessary and where the failure to be so qualified will not materially affect its operations.

(b) Subsidiaries. The Borrower has no Subsidiaries.

(c) Power and Authority. The Borrower is authorized under all applicable provisions of law to execute, deliver and perform this Agreement and the other Loan Documents, and all action on the part of the Borrower required for the lawful execution, delivery and performance of this Agreement and the other loan Documents has been duly taken. This Agreement and each of the other Loan Documents, upon the due execution and delivery thereof, will be the valid and enforceable obligation of the Borrower, in accordance with their respective terms, except as limited by bankruptcy, insolvency, or similar laws affecting the enforcement of creditors rights generally.

(d) Financial Statements. Attached hereto as Exhibit C are financial statements of the Borrower as of November 30, 2006. The financial statements of the Borrower fairly present the financial condition of the Borrower, and the Financial Statements fairly present the results of the Borrower's operations in the business described therein, as of the respective dates and for the periods covered thereby. The Financial Statements have been prepared in accordance with GAAP, consistently applied, and show all material liabilities of the Borrower, including contingent liabilities, long-term leases and unusual commitments.

(e) Title to Assets. The Borrower has good and marketable title to all of its properties and assets, including certificates of need.

(f) Litigation. There are no investigations, actions, suits, or proceedings by any federal, state or local government body, agency, or authority, or any

political subdivisions thereof, or by any person, pending, or to the knowledge of the Borrower, threatened against the Borrower, or other proceedings to which the Borrower is a party (including administrative or arbitration proceedings), (i) that involve the possibility of any judgment or liability not fully covered by insurance or by adequate reserves established by the Borrower, (ii) that may result in any material adverse change in the business or condition, financial or otherwise, of the Borrower, or (iii) that, whether or not the Borrower is a party thereto, seek to restrain, enjoin, prohibit or obtain damages or other relief with respect to the transaction contemplated by this Agreement, including, but not limited to, the denial of any necessary permit, license or certificate.

(g) Tax Returns and Cost Reports. The Borrower has filed all tax returns and cost reports required to be filed by it.

(h) Governmental Approval. The Borrower has complied and is in substantial compliance with all applicable laws and regulations of all governmental authorities. No written approval of any federal, state or local governmental authority or any political subdivision thereof, is necessary to carry out the terms of this Agreement or any of the other Loan Documents, and no consents or approvals are required in the making or performance of this Agreement or any of the other Loan Documents.

(i) ERISA. The Borrower is in compliance with all ERISA requirements.

(j) Environmental Matters. The Borrower is in compliance with all provisions of the environmental laws, and any rules, regulations and administrative orders of any governmental agency, and with any judgments, decrees or orders of any court of competent jurisdiction with respect hereto.

(k) No Untrue Statements. Neither this Agreement, nor any of the other Loan Documents, nor any other agreement, report, schedule, certificate or instrument heretofore, contains any material misrepresentation or untrue statement of material fact, or omits to state any material fact necessary to make any of such agreements, reports, schedules, certificates or instruments not misleading.

(l) Use of Proceeds and IRS Payroll Tax Liabilities. The Borrower presently owes approximately $1.451 million dollars in past-due federal payroll tax liabilities for 2005 and 2006, and that approximately $800,000 in net proceeds expected from the closing of the Asset-based Loan from Northern Healthcare Capital and approximately $300,000 from this Term Loan will be used to repay such federal payroll tax liabilities. The remaining approximately $0.351 million still owed after giving effect to such repayment will be payable by the Company in accordance with a payment plan agreed to by the IRS and the Company. In addition, the Borrower acknowledges that there are approximately $0.3 million dollars in penalties and interest asserted by the IRS as also being owed by the Borrower, and that discussions between the Borrower and the IRS are on-going with respect to the actual amount, if any, that Borrower will actually be required to pay with respect to these penalties and interest. The Borrower will provide Lenders with evidence of the receipt of payment to

the IRS as well as details regarding the payment plan and resolution of the penalties and interest discussion.

3.    <u>Affirmative Covenants</u>. The Borrower covenants that, so long as any portion of the Term Loan remains unpaid and unless the Lender otherwise consents in writing, it will:

    (a) <u>Financial Reports and Other Data.</u>  Furnish the Lenders with, as soon as available, but in any event not later than thirty (30) days after the end of each month, unaudited financial statements concerning its business for such calendar quarter and for the Borrower's fiscal year to date on a consolidated basis as necessary in conformity with GAAP, including profit and loss statements, balance sheets and such other accounting data in a format and in such detail as the Lenders shall request; and furnish the Lenders with as soon as available, but in any event not later than one hundred twenty (120) days after the end of each fiscal year of the Borrower, annual unqualified compiled (starting with 2006) and audited (starting with 2007 fiscal year) financial statements of the Borrower prepared on a consolidated basis, including balance sheets, statements of operations, changes in financial position, stockholder equity and such other accounting data as Lenders may request.

    (b) <u>Officer's Certificate.</u> Deliver, concurrent with the delivery of the annual compiled or audited financial statements mentioned in 3(a), an Officer's Certificate addressed to the Lenders acknowledging that the financial statements are true and correct and certifying (i) that no Event of Default and no default that, with the giving of notice, the passage of time, or both, would constitute an Event of Default has occurred and is continuing, or describing the nature and duration of any such Event of Default or Default and the steps that Borrower is taking to remedy such Event of Default or Default and (ii) that the Borrower is not in violation or default under any other loan or any other loan agreement.

    (c) <u>Taxes and Liens.</u> Promptly pay, or cause to be paid, all taxes, assessments and other governmental charges that may lawfully be levied or assessed upon the income or profits of the Borrower.

    (d) <u>Corporate Status.</u> Maintain its existence as a corporation in good standing under the laws of the State of Mississippi.

    (e) <u>Insurance.</u> Keep its business and properties insured at all times by responsible insurance companies to the extent that provision for such insurance is usually made by other entities engaged in similar businesses similarly situated and to the extent satisfactory to the Lenders. In addition, Jeffrey A. Morse will be required to obtain sufficient key man life insurance to repay all amounts due Lenders and listing Lenders as loss payees or beneficiary.

    (f) <u>Maintain Property.</u> Maintain its properties and facilities in good order and repair and, from time to time, make all needed and proper repairs, renewals, replacements, additions and improvements thereto, so that the

business carried on by it may be properly and advantageously conducted at all times in accordance with prudent business management.

(g) Right of Inspection. Permit any person designated by the Lenders, at the Lenders' expense, to inspect any of its properties, books and financial reports during regular business hours and upon providing reasonable advance notice, and to discuss its affairs, finances and accounts with its officers, employees, and independent certified public accountants.

(h) Knowledge of Default. Upon either the President or the Chief Financial Officer of the Borrower obtaining knowledge of an Event of Default (or an event which would constitute such an Event of Default but for the requirement that notice be given or time elapse or both) hereunder or under any other obligation of the Borrower, cause to be delivered to the Lenders an Officers' Certificate specifying the nature thereof, the period of existence thereof and what action the Borrower proposes to take thereof.

(i) Suits or Other Proceedings. Upon either the President or the Chief Financial Officer of the Borrower obtaining knowledge of any material litigation, dispute or proceedings being instituted or threatened against the Borrower, or any attachment, levy, execution or other process being instituted against any assets of the Borrower, in any case embodying or relating to a claim in excess of $100,000, cause to be delivered promptly to the Lenders an Officers' Certificate describing such litigation, dispute, proceeding, levy, execution or other process.

(j) Observe All Laws. Conform to and duly observe in all material respects all laws, regulations and other valid requirements of any regulatory authority with respect to its properties and the conduct of its business.

4.  Negative Covenants. The Borrower agrees that, so long as any portion of the Term Loan remains unpaid, unless the Lenders (by majority 51% vote as determined by the Term Loan amount held by each Lender, such 51% majority being referred to herein as the "Required Lenders") otherwise consent in writing, it will not:

(a) Liens. Except as otherwise disclosed at closing, incur, create, assume or permit to exist at any time any mortgage, pledge, security interest, lien, charge or other encumbrance of any kind on any of is assets of any kind, real or personal, tangible or intangible, whether now owned or hereafter acquired, except (i) liens or security interests securing indebtedness owed to Northern Healthcare Capital (the "Asset-based Financing"); or (ii) liens for taxes not due or that are being contested in good faith by proper proceedings.

(b) Merger or Sale of Assets. Enter into any transaction of merger or consolidation; transfer, sell, assign, lease or otherwise dispose of any of its property or assets, including Certificates of Need, except for the sale of inventory in the ordinary course of business; change its name; acquire the assets of another person other than in the ordinary course of business; sell and leaseback any of its assets, including Certificates of Need; otherwise

change its structure or identity; or materially change the nature of its business as now conducted or enter into any new business.

(c) Additional Indebtedness. Incur additional indebtedness, except for the Asset-based Financing and certain equipment lease or related financing up to $100,000 in the aggregate.

(d) Dividends. Issue or otherwise fund cash dividends to shareholders.

(e) Loans/Advances to Third Parties. Make loans or advance monies to third parties.

(f) Fiscal Year End. Change its fiscal year end.

(g) Accounting Practices. Change its accounting methods or practices from those in existence as of the date hereof, except as required to comply with law or with GAAP.

(h) Amend Certificate of Incorporation. Amend its certificate of incorporation.

5.    Conditions Precedent to Loans.

(a) Closing. The closing of the transaction contemplated hereby (the "Closing" shall be on March 26, 2007 or at such other time as the parties may agree.

(b) Conditions Precedent to the Closing. The Lenders shall have no obligation to close the transactions contemplated hereby or to make any Loans to the Borrower under the Loan Agreement until the Lenders have received the items listed below and/or the events described below have occurred, as the case may be:

    (i)    Loan Documents. The following "Loan Documents" executed by the Borrower, as applicable, and delivered to the Lenders: this Loan Agreement, the Term Notes in the form attached hereto as Exhibit A, and the Warrant Agreements in the form attached hereto as Exhibit B and any and all other agreements, instruments, and documents executed and delivered in connection with this Agreement.

    (ii)    Borrowing Resolutions. A copy of the resolutions of the Board of Directors of the Borrower authorizing the execution of this Agreement and the other Loan Documents and authorizing specified officers of the Borrower to execute and deliver this Agreement and the other Loan Documents.

    (iii)    Certificates of Incumbency. A certificate of incumbency showing the present officers and directors of the Borrower and specimen signatures of said officers and directors.

    (iv)    Certificate of Good Standing; Certificate of Incorporation; By-laws. A certified copy of the Certificate of Incorporation, as amended to date, of the Borrower and a certificate of good standing with respect to the Borrower from the Secretary of State of the State of Mississippi; and a copy of the by-laws,

                      as amended to date, of the Borrower certified by its duly elected or acting corporate secretary or assistant secretary.

    (v)    Closing of Asset-based Financing. Borrower shall close Asset-based Financing with Northern Healthcare Capital on terms that yield net availability in the range of $800,000, or less if Borrower elects not to accept term loan portion.

    (vi)    Release of IRS tax liens. Within 45 days of closing, borrower to provide copy of IRS tax lien release.

6.    Events of Default. The occurrence of one or more of the following events (an "Event of Default") shall constitute a default of the Loan:

    (a) Payment of Term Loan. The failure to pay any principal or interest payment on the Term Notes or any other amount payable hereunder or under any of the other Loan Documents, either by the terms hereof or thereof or otherwise as herein or therein provided, within ten (10) days after receipt of notice from the Lenders that such payment has not been timely made.

    (b) Payment of Other Obligations. The failure of the Borrower to pay principal of or interest on any other indebtedness beyond any period of grace provided with respect thereto, or in the performance of any other agreement, term and condition contained in any agreement or instrument under which any such indebtedness is created, if the effect of such default is to cause, or permit the holder or holders of such indebtedness to cause, such indebtedness to become due prior to its stated maturity.

    (c) Representation or Warranty. Any representation or warranty made by the Borrower herein or in any writing furnished in connection with or pursuant to this Agreement or any of the other Loan Documents shall be false or misleading in any material respect on the date as of which made or deemed reaffirmed.

    (d) Other Covenants. The failure of the Borrower to perform or observe any other agreement, covenant, term or condition binding on it contained herein or in any of the other Loan Documents, and such default shall not have been remedied within 30 days after written notice thereof to the Borrower from the Lenders.

    (e) Liquidation; Dissolution; Voluntary Bankruptcy. The liquidation or dissolution of the Borrower, or the suspension of the business of the Borrower, or the filing by the Borrower of a voluntary petition or an answer seeking reorganization, arrangement, readjustment of its debts or for any other relief under the United States Bankruptcy Code, as amended, or under any other insolvency act or law, state or federal, now or hereafter existing, or any other action of the Borrower indicating its consent to, approval of or acquiescence in, any such petition or proceeding; the application by the Borrower for, or the appointment by consent or acquiescence of the Borrower of a receiver, a trustee or a custodian of the Borrower for all or a substantial part of its property; the making by the

Borrower of any assignment for the benefit of creditors; the inability of the Borrower or the admission by the Borrower in writing of its inability to pay its debts as they mature; or the Borrower taking any corporate action to authorize any of the foregoing.

(f) Involuntary Bankruptcy. The filing of an involuntary petition against the Borrower in bankruptcy or seeking reorganization, arrangement readjustment of its debts or for any other relief under the United States Bankruptcy Code, as amended, or under any other insolvency act or law, state or federal, now hereafter existing; or the involuntary appointment of a receiver, a trustee or a custodian of the Borrower for all or a substantial part of its property; or the issuance of a warrant of attachment, execution or similar process against any substantial part of the property of the Borrower, and the continuance of any of such events for 30 days undismissed or undischarged.

(g) Adjudication of Bankruptcy. The adjudication of the Borrower as bankrupt or insolvent.

(h) Order of Dissolution. The entering of any order in any proceedings against the Borrower decreeing the dissolution, divestiture or split-up of the Borrower, and such order remains in effect for more than 60 days.

(i) Reports and Certificates. Any report, certificate, financial statement or other instrument delivered to the Lenders by or on behalf of Borrower is at the time of delivery is false or misleading in any material aspect.

(j) Judgment. A final judgment, which with other outstanding final judgments against the Borrower exceeds an aggregate of $100,000, shall be rendered against the Borrower, and if within 30 days after entry thereof such judgment shall not have been discharged or execution thereon stayed pending appeal, or if within 30 days after the expiration of any such stay, such judgment shall not have been discharged.

7.   Remedies.

(a) Acceleration and Setoff. Upon the occurrence of any Event of Default, and at any time thereafter as long as the Event of Default is continuing, the Required Lenders may, without notice, declare the entire principal and all interest on the Term Loan and all obligations under the Loan Documents, and all other indebtedness of the Borrower to the Lenders, whether the Borrower's liability for payment thereof is primary or secondary, direct or indirect, sole, joint, several or joint and several, or whether the indebtedness is matured or unmatured, due or to become due, fixed, absolute or contingent, to be immediately due and payable (without presentment, demand, protest or other notice of any kind, all of which are expressly waived) and the Loan and all such other indebtedness thereupon shall be and become immediately due and payable, and the Lenders may proceed to collect the same by foreclosure, at law, or as otherwise provided in the Loan Documents and/or other instruments or agreements signed by the Borrower.

(b) <u>Cumulative Remedies.</u> All rights, remedies or recourses of the Lenders under this Agreement, the Term Notes, or any other Loan Documents, in equity or otherwise, are cumulative, and exercisable concurrently, and may be pursued singularly, successively or together and may be exercised as often as occasion therefore shall arise. No act of commission or omission by the Lenders, including, but not limited to, any failure to exercise, or any delay, forbearance or indulgence in the exercise of, any right, remedy or recourse hereunder of any other Loan Documents shall be deemed a waiver, release or modification of that or any other right, remedy or recourse, and no single or partial exercise of the right, remedy or recourse or the exercise of any other right, remedy or recourse. No waiver or release of any such rights, remedies and recourses shall be effective against the Lenders unless in writing and manually signed by an authorized officer for each of the Required Lenders' behalf, and then only to the extent recited therein. A waiver, release or modification with reference to any one event shall not be construed as continuing or constituting a course of dealing, nor shall it be construed as a bar to, or as a waiver, release or modification of, any subsequent right, remedy or recourse as to a subsequent event.

8. <u>Miscellaneous.</u>

(a) <u>Waiver of Default.</u> The Required Lenders may, by written notice to the Borrower at any time and from time to time, waive any default in the performance or observance of any condition, covenant or other term hereof or any Event of Default that shall have occurred hereunder and its consequences. Any such waiver shall be for such period and subject to such conditions as shall be specified in any such notice. In the case of any such waiver, the Borrower shall be restored to its former position hereunder and under the Loan Documents, and any Event of Default so waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Event of Default.

(b) <u>Amendments and Waivers.</u> The Required Lenders and the Borrower may from time to time, enter into written agreements for the purpose of adding any provision to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or the Borrower hereunder or under the other Loan Documents other than (i) changing the principal amount of any Lender's loan, or (ii) changing the definition of Required Lenders.

(c) <u>No Waiver; Cumulative Remedies.</u> No failure to exercise and no delay in exercising, on the part of the Lenders, any right, power or privilege hereunder or under any of the other Loan Documents shall operate as a waiver thereof. The rights and remedies herein and in the other Loan Documents provided are cumulative and not exclusive of any rights or remedies provided by law.

(d) <u>Survival of Representations, Warranties and Covenants</u>. All representations, warranties, covenants and other agreements made herein shall survive the execution and delivery of this Agreement and the other Loan Documents.

(e) <u>Georgia Law</u>. This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the laws of the State of Georgia.

(f) <u>Severability</u>. Each paragraph, provision, sentence and part thereof of this Agreement shall be deemed separate from each other paragraph, provision, sentence or part thereof, and the invalidity or unenforceability for any reason or to any extent of any such portion of this Agreement shall not affect the enforceability of the remaining portions of this Agreement or of any of the other Loan Documents.

(g) <u>Reimbursement of Expenses</u>. The Borrower agrees to reimburse the Lenders for all reasonable expenses incurred by Lenders (including attorneys' fees) in the collection of any indebtedness incurred hereunder upon the occurrence and continuation of an Event of Default by Borrower.

(h) <u>Jurisdiction and Venue</u>. In the event that legal action is instituted to enforce or interpret this Agreement or any other of the Loan Documents, or to collect the Term Loan or any other amount due from the Borrower, the Borrower, on behalf of itself and its successors and assigns, consents to and by execution of this Agreement submit itself to, the jurisdiction of the courts of the State of Georgia, and notwithstanding the place of business of Borrower or the place of execution of this Agreement or any of the other Loan Documents, any litigation relating to this Agreement and to any of the other Loan Documents, whether arising in contract or tort, by statute or otherwise, shall be brought in (and, if brought elsewhere, may be transferred to) a state court of competent jurisdiction in Dekalb County, Georgia.

(i) <u>Execution in Counterparts</u>. This Agreement and the other Loan Documents may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.

(j) <u>New Lenders and Assignments</u>. So long as the aggregate obligations to fund the Term Loan, and the Term Loan balance, does not exceed $1,000,000, the Borrower may obtain additional Lenders reasonably acceptable to the Required Lenders so long as such new Lender executes and delivers to the Borrower and the Lenders a written agreement stating that such Lender agrees to the terms of this Agreement as a "Lender" hereunder and states such new Lender's amount of the Term Loan it has agreed to fund hereunder, the Borrower agreeing to execute and deliver to such new Lender a Term Note in such amount and Warrant for the purchase of Borrower's shares in the proportionate amount received by other Lenders. The Borrower may not assign its rights or obligations under this Agreement, but each Lender may assign its rights under this

Agreement to a new Lender reasonably acceptable to the Required Lenders.

IN WITNESS WHEREOF, the Borrower and Lenders have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

BORROWER:

Brandywine Health Services of Mississippi, Inc.
d/b/a Choctaw County Medical Center

By:_____

LENDERS:

_____
Philip A. Marsden
Lender obligation to fund Term Loan not to exceed $150,000.00

_____
Donald R. Millard
Lender obligation to fund Term Loan not to exceed $100,000.00

_____
Hoppy Enterprises, LLC
Lender obligation to fund Term Loan not to exceed $200,000.00

_____
Marshall B. Hunt
Lender obligation to fund Term Loan not to exceed $100,000.00

_____
Olin Garwood Lippincott
Lender obligation to fund Term Loan not to exceed $75,000.00

_____
PWP Investments, LLC
Lender obligation to fund Term Loan not to exceed $25,000.00

The undersigned hereby agrees to be bound by Sections 1(3) and 3(e) of this Loan Agreement.

_____
Jeffrey A. Morse

Agreement to a new Lender reasonably acceptable to the Required Lenders.

IN WITNESS WHEREOF, the Borrower and Lenders have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

BORROWER:

Brandywine Health Services of Mississippi, Inc.
d/b/a Choctaw County Medical Center

By

LENDERS:

Philip A. Marsden
Lender obligation to fund Term Loan not to exceed $150,000.00

Donald R. Millard
Lender obligation to fund Term Loan not to exceed $100,000.00

Hoppy Enterprises, LLC
Lender obligation to fund Term Loan not to exceed $200,000.00

Marshall B. Hunt
Lender obligation to fund Term Loan not to exceed $100,000.00

Olin Garwood Lippincott
Lender obligation to fund Term Loan not to exceed $75,000.00

PWP Investments, LLC
Lender obligation to fund Term Loan not to exceed $25,000.00

The undersigned hereby agrees to be bound by Sections 1(3) and 3(e) of this Loan Agreement.

Jeffrey A. Morse

Agreement to a new Lender reasonably acceptable to the Required Lenders.

IN WITNESS WHEREOF, the Borrower and Lenders have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

BORROWER:

Brandywine Health Services of Mississippi, Inc.
d/b/a Choctaw County Medical Center

By: _____

LENDERS:

_____
Philip A. Marsden
Lender obligation to fund Term Loan not to exceed $150,000.00

_____
Donald R. Millard
Lender obligation to fund Term Loan not to exceed $100,000.00

_____
Hoppy Enterprises, LLC
Lender obligation to fund Term Loan not to exceed $200,000.00

_____
Marshall B. Hunt
Lender obligation to fund Term Loan not to exceed $100,000.00

_____
Olin Garwood Lippincott
Lender obligation to fund Term Loan not to exceed $75,000.00

_____
PWP Investments, LLC
Lender obligation to fund Term Loan not to exceed $25,000.00

The undersigned hereby agrees to be bound by Sections 1(3) and 3(e) of this Loan Agreement.

_____
Jeffrey A. Morse

Agreement to a new Lender reasonably acceptable to the Required
Lenders.

IN WITNESS WHEREOF, the Borrower and Lenders have caused this Agreement to be
duly executed by their duly authorized officers, all as of the day and year first above
written.

BORROWER:

    Brandywine Health Services of Mississippi, Inc.
    d/b/a Choctaw County Medical Center

By: _____

LENDERS:

_____

Philip A. Marsden
Lender obligation to fund Term Loan not to exceed $150,000.00

_____

Donald R. Millard
Lender obligation to fund Term Loan not to exceed $100,000.00

_____

Hoppy Enterprises, LLC
Lender obligation to fund Term Loan not to exceed $200,000.00

_____

Marshall B. Hunt
Lender obligation to fund Term Loan not to exceed $100,000.00

_____

Olin Garwood Lippincott
Lender obligation to fund Term Loan not to exceed $75,000.00

_____

PWP Investments, LLC
Lender obligation to fund Term Loan not to exceed $25,000.00

The undersigned hereby agrees to be bound by Sections 1(3) and 3(e) of this Loan
Agreement.

_____

Jeffrey A. Morse

Agreement to a new Lender reasonably acceptable to the Required Lenders.

IN WITNESS WHEREOF, the Borrower and Lenders have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

BORROWER:

Brandywine Health Services of Mississippi, Inc.
d/b/a Choctaw County Medical Center

By: _____

LENDERS:

_____
Philip A. Marsden
Lender obligation to fund Term Loan not to exceed $150,000.00

_____
Donald R. Millard
Lender obligation to fund Term Loan not to exceed $100,000.00

_____
Hoppy Enterprises, LLC
Lender obligation to fund Term Loan not to exceed $200,000.00

_____
Marshall B. Hunt
Lender obligation to fund Term Loan not to exceed $100,000.00

_____
Olin Garwood Lippincott
Lender obligation to fund Term Loan not to exceed $75,000.00

_____
PWP Investments, LLC
Lender obligation to fund Term Loan not to exceed $25,000.00

The undersigned hereby agrees to be bound by Sections 1(3) and 3(e) of this Loan Agreement.

_____
Jeffrey A. Morse




Agreement to a new Lender reasonably acceptable to the Required Lenders.

IN WITNESS WHEREOF, the Borrower and Lenders have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

BORROWER:

Brandywine Health Services of Mississippi, Inc.
d/b/a Choctaw County Medical Center

By: _____

LENDERS:

_____
Philip A. Marsden
Lender obligation to fund Term Loan not to exceed $150,000.00

_____
Donald R. Millard
Lender obligation to fund Term Loan not to exceed $100,000.00

_____
Hoppy Enterprises, LLC
Lender obligation to fund Term Loan not to exceed $200,000.00

_____
Marshall B. Hunt
Lender obligation to fund Term Loan not to exceed $100,000.00

_____
Olin Garwood Lippincott
Lender obligation to fund Term Loan not to exceed $75,000.00

_____
PWP Investments, LLC
Lender obligation to fund Term Loan not to exceed $25,000.00

The undersigned hereby agrees to be bound by Sections 1(3) and 3(e) of this Loan Agreement.

_____
Jeffrey A. Morse

THE SECURITIES EVIDENCED BY THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF SUCH SECURITIES REASONABLY SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

## WARRANT TO PURCHASE COMMON STOCK

1) <u>Number of Shares Subject to Warrant</u>. FOR VALUE RECEIVED, on and under the date hereof, and subject to the terms and conditions herein set forth, the Holder (as defined below) is entitled to purchase from BRANDYWINE HEALTH SERVICES OF MISSISSIPPI, INC. (d/b/a Choctaw County Medical Center and Nursing Home), a Mississippi corporation (the "Company"), at any time before March 26, 2012 (the "Termination Date"), 30 shares of the Company's common stock ("Common Stock") at a price per share equal to the Warrant Price (as defined below) subject to adjustments as described below, upon exercise of this Warrant pursuant to Section 7 hereof.

2) <u>Definitions</u>. As used in this Warrant, the following terms shall have the definitions ascribed to them below:

    (a) "Holder" shall mean the undersigned "Lender" party to the Loan Agreement between Company and Lender, among others (as amended, the "Loan Agreement"), the Term Note issued by the Company to Lender in connection therewith, and all other agreements, instruments and documents executed and delivered in connection therewith all dated on or about even date herewith (as amended from time to time, collectively, the "Loan Documents").

    (b) "Securities" shall mean shares of the Company's Common Stock.

    (c) "Shares Outstanding at Issuance" shall mean 1,000 (insert fully diluted outstanding as of date of issuance).

    (d) "Warrant Price" shall mean $0.01 per share of the Company's Common Stock.

    (e) "Warrant Stock" shall mean the Securities purchasable upon exercise of this Warrant or issuable upon exercise of this Warrant.

3) <u>Adjustments Upon Changes in Shares or Organizational Documents</u>. (a)    If all or any portion of this Warrant shall be exercised after any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional



shares for less than fair market value as determined under this Warrant, or other similar event, occurring after the date hereof, then Holder upon exercising this Warrant shall receive, for the aggregate purchase price paid upon such exercise, the aggregate number of Securities Holder would have received if this Warrant had been exercised immediately prior to such any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event. If any adjustment under this paragraph would create a fractional share of Common Stock or a right to acquire a fractional share of Common Stock, such fractional share shall be disregarded and the number of shares subject to this Warrant shall be the next higher number of shares, rounding all fractions upward. Whenever there shall be any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event pursuant to this paragraph, the Company shall forthwith notify the Holder of this Warrant of such stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.

(b)     If all or any portion of this Warrant shall be exercised after any merger, consolidation, exchange of shares, separation, reorganization or liquidation of the Company, or other similar event, occurring after the date hereof, as a result of which shares of Common Stock shall be changed into the same or a different number of shares of the same or another class or classes of securities of the Company or another entity (excluding conversion of the Company to an S corporation under the federal tax code), or the holders of Common Stock are entitled to receive cash or other property, then the Holder exercising this Warrant shall receive, for the aggregate price paid upon such exercise, the aggregate number and class of shares, cash or other property which such Holder would have received if this Warrant had been exercised immediately prior to such merger, consolidation, exchange of shares, separation, reorganization or liquidation, or other similar event. If any adjustment under this paragraph would create a fractional share of Common Stock or a right to acquire a fractional share of Common Stock, such fractional share shall be disregarded and the number of shares subject to this Warrant shall be the next higher number of shares, rounding all fractions upward. Whenever there shall be an adjustment pursuant to this paragraph, the Company shall forthwith notify the Holder of this Warrant of such adjustment, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.

(c)     The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed

hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against impairment.

4) <u>No Stockholder Rights</u>. This Warrant, by itself, as distinguished from any shares purchased hereunder, shall not entitle its Holder to any of the rights of a stockholder of the Company.

5) <u>Representations and Covenants of the Company</u>.

  (a) <u>Reservation of Stock</u>. On and after the date hereof, the Company will reserve from its authorized and unissued Securities a sufficient number of shares to provide for the issuance of Warrant Stock upon the exercise or conversion of this Warrant. Issuance of this Warrant shall constitute full authority to the Company's officers who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Warrant Stock issuable upon the exercise or conversion of this Warrant.

  (b) <u>Issuance of Shares</u>. The Company covenants that the Warrant Stock, when issued pursuant to the exercise of this Warrant, will be duly and validly issued, fully paid and nonassessable and free from all taxes, liens, and charges with the respect to the issuance thereof.

  (c) <u>Notice</u>. The Company agrees to notify the Holder of this Warrant in writing at least fifteen (15) days prior to the closing of (any of the following items in this paragraph (c) below are referred to herein as a "Company Sale"): (i) a sale or transfer of the Company or all or substantially all of the Company's assets, (ii) a merger, consolidation or other transaction or series of related transactions, resulting in the exchange of the outstanding shares of the Company's capital stock such that the stockholders of the Company prior to such transaction own, directly or indirectly, less than 50% of the voting power of the surviving entity, or (iii) the issuance and sale of shares of Common Stock of the Company in a public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Act").

  (d) <u>Loss of Warrant</u>. Upon receipt of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant, and (in the case of loss, theft or destruction), of indemnification satisfactory to the Company, and upon surrender and cancellation of this Warrant, if mutilated, the Company shall execute and deliver to Holder a new Warrant of like tenor and date.

  (e) <u>Certificates for Shares</u>. Upon the exercise of the purchase rights evidenced by this Warrant, one or more certificates for the number of Securities so purchased shall be issued as soon as practicable thereafter, and in any event within thirty (30) days of the delivery of the Holder's notice of exercise hereunder ("Notice of Exercise").

6) Representations of the Holder. The Holder hereby represents and warrants that:

(a) Purchase Entirely for Own Account. This Warrant and the Securities issuable upon the conversion of this Warrant to be received by the Holder will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and the Holder has not present intention of selling, granting any participation in, or otherwise distributing the same. The Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or to any third person, with respect to the Warrant or any of the Securities issuable upon the conversion of the Warrant.

(b) Investment Experience. The Holder is an "accredited" investor under all applicable laws and invests in securities of companies in the development stage and acknowledges that is has the capacity to protect its own interests, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in this Warrant and the Securities issuable upon the conversion of this Warrant. If other than an individual, the Holder also represents it has not been organized for the purpose of acquiring this Warrant or the Securities issuable upon the conversion of this Warrant.

(c) Restricted Securities. The Holder understands that this Warrant and the Securities issuable upon the conversion of this Warrant are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Act, only in certain limited circumstances. The Holder is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

7. Exercise of Warrant. This Warrant may be exercised in whole or in part by the Holder, at any time and from time to time after the date hereof and prior to the Termination Date, by the surrender of this Warrant, together with the Notice of Exercise, duly completed and executed at the principal office of the Company, specifying the portion of the Warrant to be exercised and accompanied by payment in full of the Warrant Price in cash or by check with respect to the shares of the Warrant Stock being purchased. This Warrant shall be deemed to have been exercised immediately prior to the close of business on the date of its surrender for exercise as provided above, and the person entitled to receive the shares of Warrant Stock issuable upon such exercise shall be treated for all purposes as the Holder of such shares of record as of the close of business on such date. As promptly as practicable after such date, the Company shall issue and deliver to the person or persons entitled to receive the same a certificate or certificates for the

number of full shares of Warrant Stock issuable upon such exercise. If the Warrant shall be exercised for less than the total number of shares of Warrant Stock then issuable upon exercise, promptly after surrender of the Warrant upon such exercise, the Company will execute and deliver a new Warrant, dated the date hereof, evidencing the right of the Holder to the balance of the Warrant Stock purchasable hereunder upon the same terms and conditions set forth herein.

8.  Valuation. For purposes of this Section 8, the fair market value of one share of Common Stock as of a particular date shall be determined as follows: if there is no active public market value, the value shall be determined by an appraisal conducted by a certified independent third-party appraiser, with such appraised value reduced by the Company's long-term debt as shown on its balance sheet as of the close of the most recent month, and divided by the fully-diluted number of Outstanding Shares of Common Stock to determine a per share value. The first such appraisal shall occur on or about March 31, 2009, and to the extent there are still Warrants outstanding, a second appraisal shall occur on or about March 31, 2010, and as necessary the third and final appraisal shall occur on or about March 31, 2011. Notwithstanding the foregoing, if, as of the date of determination of the fair market value hereunder, the Company has entered into a definitive agreement for a transaction described in Section 5(c)(i) or 5(c)(ii), the fair market value of one share of Common Stock shall be the fair market value of the shares of Common Stock ascribed to the Common Stock in such transaction.

9.  Minimum Payment Option. In lieu of exercising this Warrant pursuant to Section 7, the Holder may elect (the "Minimum Payment Option") to receive a cash payment (the "Minimum Payment Option Amount"), and the Company agrees to pay an amount equal to Twenty Five Thousand Dollars ($25,000) for each Fifty Thousand Dollars ($50,000) (or portion thereof rounded upwards) such Holder has advanced to the Company pursuant to the Loan Documents. Such Minimum Payment Option may be exercised by Holder at any time (through and including the Termination Date) on and after the earlier to occur of (x) April 1, 2009 and (y) a Company Sale. In such an event, the Holder will provide written notice to the Company regarding election of the Minimum Payment Option, and will surrender the Warrant after Company's cash payment of the Minimum Payment Option Amount, which cash payment must be made no later than 30 days after receipt of notice.

10. Piggyback Rights. If at any time the Company proposes to prepare and file with the Securities and Exchange Commission (the "SEC") one of more registration statements or amendments, including post-effective amendments, or supplements thereto covering any equity or debt securities of the Company, or any such securities of the Company held by its stockholders, other than in connection with a merger or acquisition or pursuant to a registration statement on Form S-4 or Form S-8 or an successor form (for purposes of this Section 1, collectively, a "Piggyback Registration Statement"), the Company will give written notice of its intention to do so by registered or certified mail ("Notice"), at least twenty (20)

business days prior to the filing of each such Piggyback Registration Statement, to the Holder. The Company shall include all Warrant Stock in the proposed Piggyback Registration Statement with respect to which the Company has received written requests for inclusion therein within 20 days after the receipt of the Company's notice, and the Company shall use its best efforts to cause such Piggyback Registration Statement to be declared effective by the SEC, so as to permit the public resale by the requesting Holders'of their Warrant Stock pursuant thereto, at the Company's sole cost and expense and at no cost or expense to the requesting Holder (other than any underwriting or other commissions, discounts or fees of any counsel or advisor to the Holder which shall be payable by the Holder). The Company shall not be required to include the Warrant Stock in more than one registration statement filed with the SEC.

11. Adjustments to Warrant Stock and Minimum Payment Option Amount Upon Payment Default under the Loan Agreement. Upon the occurrence of an Event of Default (defined in the Loan Agreement) under section 6(a) of the Loan Agreement and such Event of Default continues (a) for more than ten (10) days past the due date therefor, then, in such event, (i) the number of Warrant Stock shares issuable hereunder to the Holder shall be increased by 25% and (ii) the Minimum Payment Option amount shall be increased by 25% and (b) for more than ninety (90) days past the due date therefor (or an additional Event of Default under section 6(a) of the Loan Agreement occurs thereafter, regardless of any cure of any previous Event of Default), then, in such event, (i) the number of Warrant Stock shares issuable hereunder to the Holder shall be increased by 200% and (ii) the Minimum Payment Option amount shall be increased by 200%.

12. Redemption.

(a) Election by Holder. At any time after the earlier to occur of (x) March 31, 2009 and (y) a Company Sale, the Holder may, by written notice to the Company (a "Redemption Request") but no more than once per calendar year, request that the Company redeem all or some portion of the Warrants. The Company shall complete such redemption, by payment to the Holder, at the Redemption Price (as defined below), against delivery by the Holder of this Warrant, within 30 days after the Redemption Request, if (A) below, or in four (4) equal payments, the first within 30 days after the Redemption Request and the remaining three (3) each to occur ninety (90) days after the previous payment, if (B) below. The "Redemption Price" shall be equal to the greater of (A) the Minimum Payment Option Amount or (B) (i) the difference between (y) the fair market value (determined as the greater of (1) the purchase price (adjusted by the level of long-term debt as reported on the most recent month's balance sheet in the event of an asset sale) to paid by the purchasers in the pending Company Sale and (2) the most recent appraisal, adjusted by the level of long-term debt as reported on the most recent month's balance sheet, pursuant to Section 8 hereof) of a share of Common Stock, and (z)

the Warrant Price, multiplied by (ii) the number of shares of Warrant Stock underlying the Warrants covered by the Redemption Request.

(b) Election by Company. At any time after the earlier to occur of (x) March 31, 2010 and (y) a Company Sale, the Company may, by written notice to the Holder (a "Call Notice"), require that the Holder permit the redemption of all or some portion of this Warrant, upon the terms and conditions set forth in this Section 12(b). The Company shall complete such redemption by payment to the Holder the Call Price (as defined below), against delivery by the Holder of this Warrant, within 30 days after the Call Notice if (A) below or in four (4) equal payments, the first within 30 days after receipt of the Call Notice, and the remaining three (3) each to occur ninety (90) days after the previous payment, if (B) below. The "Call Price" shall be equal to the greater of (A) the Minimum Payment Option Amount or (B) (i) the difference between (y) the fair market value (determined as the greater of (1) the purchase price (adjusted by the level of long-term debt as reported on the most recent month's balance sheet in the event of an asset sale) to be paid by the purchasers in the pending Company Sale and (2) the most recent appraisal, adjusted by the level of long-term debt as reported on the most recent month's balance sheet, pursuant to Section 8 hereof) of a share of Common Stock, and (z) the Warrant Price, multiplied by (ii) the number of shares of Warrant Stock underlying the Warrants covered by the Call Notice.

13. Transfer of Warrant. This Warrant may be transferred or assigned by the Holder hereof in whole or in part upon notice to the Company.

14. Termination. This Warrant shall terminate on the Termination Date.

15. Miscellaneous. This Warrant shall be governed by the laws of the State of Georgia, as such laws are applied to contracts to be entered into and performed entirely in Georgia. The headings in this Warrant are for purposes of convenience and reference only, and shall not be deemed to constitute a part hereof. Neither this Warrant nor any term hereof may be changed or waived orally, but only by an instrument in writing signed by the Company and the Holder of this Warrant. All notices and other communications from the Company to the Holder of this Warrant shall be delivered personally or mailed by first class mail, postage prepaid, to the address furnished to the Company in writing by the last Holder of this Warrant who shall have furnished an address to the Company in writing, and if mailed shall be deemed given three days after deposit in the United States mail.

*[signatures contained on the next page]*

8

IN WITNESS HEREOF, the Company has duly caused this Warrant to be signed in its name and on its behalf by its duly authorized officers as of the date hereof.

ISSUED:   March 26, 2007

Brandywine Health Services of Mississippi, Inc.
d/b/a Choctaw County Medical Center (and nursing home)

By: _Jeffrey A. Morse_____

Name: _Jeffrey A. Morse_____

Title: _President_____

ACKNOWLEDGED AND AGREED:

By:_Philip A. Marsden_____

Philip A. Marsden

Warrant Holder

230551 v3

THE SECURITIES EVIDENCED BY THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF SUCH SECURITIES REASONABLY SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

## WARRANT TO PURCHASE COMMON STOCK

1) <u>Number of Shares Subject to Warrant</u>. FOR VALUE RECEIVED, on and under the date hereof, and subject to the terms and conditions herein set forth, the Holder (as defined below) is entitled to purchase from BRANDYWINE HEALTH SERVICES OF MISSISSIPPI, INC. (d/b/a Choctaw County Medical Center and Nursing Home), a Mississippi corporation (the "Company"), at any time before March 26, 2012 (the "Termination Date"), 20 shares of the Company's common stock ("Common Stock") at a price per share equal to the Warrant Price (as defined below) subject to adjustments as described below, upon exercise of this Warrant pursuant to Section 7 hereof.

2) <u>Definitions</u>. As used in this Warrant, the following terms shall have the definitions ascribed to them below:

    (a) "Holder" shall mean the undersigned "Lender" party to the Loan Agreement between Company and Lender, among others (as amended, the "Loan Agreement"), the Term Note issued by the Company to Lender in connection therewith, and all other agreements, instruments and documents executed and delivered in connection therewith all dated on or about even date herewith (as amended from time to time, collectively, the "Loan Documents").

    (b) "Securities" shall mean shares of the Company's Common Stock.

    (c) "Shares Outstanding at Issuance" shall mean 1,000 (insert fully diluted outstanding as of date of issuance).

    (d) "Warrant Price" shall mean $0.01 per share of the Company's Common Stock.

    (e) "Warrant Stock" shall mean the Securities purchasable upon exercise of this Warrant or issuable upon exercise of this Warrant.

3) <u>Adjustments Upon Changes in Shares or Organizational Documents</u>. (a)    If all or any portion of this Warrant shall be exercised after any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional



230551 v3

shares for less than fair market value as determined under this Warrant, or other similar event, occurring after the date hereof, then Holder upon exercising this Warrant shall receive, for the aggregate purchase price paid upon such exercise, the aggregate number of Securities Holder would have received if this Warrant had been exercised immediately prior to such any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event. If any adjustment under this paragraph would create a fractional share of Common Stock or a right to acquire a fractional share of Common Stock, such fractional share shall be disregarded and the number of shares subject to this Warrant shall be the next higher number of shares, rounding all fractions upward. Whenever there shall be any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event pursuant to this paragraph, the Company shall forthwith notify the Holder of this Warrant of such stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.

(b) If all or any portion of this Warrant shall be exercised after any merger, consolidation, exchange of shares, separation, reorganization or liquidation of the Company, or other similar event, occurring after the date hereof, as a result of which shares of Common Stock shall be changed into the same or a different number of shares of the same or another class or classes of securities of the Company or another entity (excluding conversion of the Company to an S corporation under the federal tax code), or the holders of Common Stock are entitled to receive cash or other property, then the Holder exercising this Warrant shall receive, for the aggregate price paid upon such exercise, the aggregate number and class of shares, cash or other property which such Holder would have received if this Warrant had been exercised immediately prior to such merger, consolidation, exchange of shares, separation, reorganization or liquidation, or other similar event. If any adjustment under this paragraph would create a fractional share of Common Stock or a right to acquire a fractional share of Common Stock, such fractional share shall be disregarded and the number of shares subject to this Warrant shall be the next higher number of shares, rounding all fractions upward. Whenever there shall be an adjustment pursuant to this paragraph, the Company shall forthwith notify the Holder of this Warrant of such adjustment, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.

(c) The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed

hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against impairment.

4) No Stockholder Rights. This Warrant, by itself, as distinguished from any shares purchased hereunder, shall not entitle its Holder to any of the rights of a stockholder of the Company.

5) Representations and Covenants of the Company.

    (a) Reservation of Stock. On and after the date hereof, the Company will reserve from its authorized and unissued Securities a sufficient number of shares to provide for the issuance of Warrant Stock upon the exercise or conversion of this Warrant. Issuance of this Warrant shall constitute full authority to the Company's officers who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Warrant Stock issuable upon the exercise or conversion of this Warrant.

    (b) Issuance of Shares. The Company covenants that the Warrant Stock, when issued pursuant to the exercise of this Warrant, will be duly and validly issued, fully paid and nonassessable and free from all taxes, liens, and charges with the respect to the issuance thereof.

    (c) Notice. The Company agrees to notify the Holder of this Warrant in writing at least fifteen (15) days prior to the closing of (any of the following items in this paragraph (c) below are referred to herein as a "Company Sale"): (i) a sale or transfer of the Company or all or substantially all of the Company's assets, (ii) a merger, consolidation or other transaction or series of related transactions, resulting in the exchange of the outstanding shares of the Company's capital stock such that the stockholders of the Company prior to such transaction own, directly or indirectly, less than 50% of the voting power of the surviving entity, or (iii) the issuance and sale of shares of Common Stock of the Company in a public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Act").

    (d) Loss of Warrant. Upon receipt of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant, and (in the case of loss, theft or destruction), of indemnification satisfactory to the Company, and upon surrender and cancellation of this Warrant, if mutilated, the Company shall execute and deliver to Holder a new Warrant of like tenor and date.

    (e) Certificates for Shares. Upon the exercise of the purchase rights evidenced by this Warrant, one or more certificates for the number of Securities so purchased shall be issued as soon as practicable thereafter, and in any event within thirty (30) days of the delivery of the Holder's notice of exercise hereunder ("Notice of Exercise").

6) Representations of the Holder. The Holder hereby represents and warrants that:

    (a) Purchase Entirely for Own Account. This Warrant and the Securities issuable upon the conversion of this Warrant to be received by the Holder will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and the Holder has not present intention of selling, granting any participation in, or otherwise distributing the same. The Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or to any third person, with respect to the Warrant or any of the Securities issuable upon the conversion of the Warrant.

    (b) Investment Experience. The Holder is an "accredited" investor under all applicable laws and invests in securities of companies in the development stage and acknowledges that is has the capacity to protect its own interests, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in this Warrant and the Securities issuable upon the conversion of this Warrant. If other than an individual, the Holder also represents it has not been organized for the purpose of acquiring this Warrant or the Securities issuable upon the conversion of this Warrant.

    (c) Restricted Securities. The Holder understands that this Warrant and the Securities issuable upon the conversion of this Warrant are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Act, only in certain limited circumstances. The Holder is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

7.    Exercise of Warrant. This Warrant may be exercised in whole or in part by the Holder, at any time and from time to time after the date hereof and prior to the Termination Date, by the surrender of this Warrant, together with the Notice of Exercise, duly completed and executed at the principal office of the Company, specifying the portion of the Warrant to be exercised and accompanied by payment in full of the Warrant Price in cash or by check with respect to the shares of the Warrant Stock being purchased. This Warrant shall be deemed to have been exercised immediately prior to the close of business on the date of its surrender for exercise as provided above, and the person entitled to receive the shares of Warrant Stock issuable upon such exercise shall be treated for all purposes as the Holder of such shares of record as of the close of business on such date. As promptly as practicable after such date, the Company shall issue and deliver to the person or persons entitled to receive the same a certificate or certificates for the

number of full shares of Warrant Stock issuable upon such exercise. If the Warrant shall be exercised for less than the total number of shares of Warrant Stock then issuable upon exercise, promptly after surrender of the Warrant upon such exercise, the Company will execute and deliver a new Warrant, dated the date hereof, evidencing the right of the Holder to the balance of the Warrant Stock purchasable hereunder upon the same terms and conditions set forth herein.

8.    Valuation. For purposes of this Section 8, the fair market value of one share of Common Stock as of a particular date shall be determined as follows: if there is no active public market value, the value shall be determined by an appraisal conducted by a certified independent third-party appraiser, with such appraised value reduced by the Company's long-term debt as shown on its balance sheet as of the close of the most recent month, and divided by the fully-diluted number of Outstanding Shares of Common Stock to determine a per share value. The first such appraisal shall occur on or about March 31, 2009, and to the extent there are still Warrants outstanding, a second appraisal shall occur on or about March 31, 2010, and as necessary the third and final appraisal shall occur on or about March 31, 2011. Notwithstanding the foregoing, if, as of the date of determination of the fair market value hereunder, the Company has entered into a definitive agreement for a transaction described in Section 5(c)(i) or 5(c)(ii), the fair market value of one share of Common Stock shall be the fair market value of the shares of Common Stock ascribed to the Common Stock in such transaction.

9.    Minimum Payment Option. In lieu of exercising this Warrant pursuant to Section 7, the Holder may elect (the "Minimum Payment Option") to receive a cash payment (the "Minimum Payment Option Amount"), and the Company agrees to pay an amount equal to Twenty Five Thousand Dollars ($25,000) for each Fifty Thousand Dollars ($50,000) (or portion thereof rounded upwards) such Holder has advanced to the Company pursuant to the Loan Documents. Such Minimum Payment Option may be exercised by Holder at any time (through and including the Termination Date) on and after the earlier to occur of (x) April 1, 2009 and (y) a Company Sale. In such an event, the Holder will provide written notice to the Company regarding election of the Minimum Payment Option, and will surrender the Warrant after Company's cash payment of the Minimum Payment Option Amount, which cash payment must be made no later than 30 days after receipt of notice.

10.   Piggyback Rights. If at any time the Company proposes to prepare and file with the Securities and Exchange Commission (the "SEC") one of more registration statements or amendments, including post-effective amendments, or supplements thereto covering any equity or debt securities of the Company, or any such securities of the Company held by its stockholders, other than in connection with a merger or acquisition or pursuant to a registration statement on Form S-4 or Form S-8 or an successor form (for purposes of this Section 1, collectively, a "Piggyback Registration Statement"), the Company will give written notice of its intention to do so by registered or certified mail ("Notice"), at least twenty (20)

business days prior to the filing of each such Piggyback Registration Statement, to the Holder. The Company shall include all Warrant Stock in the proposed Piggyback Registration Statement with respect to which the Company has received written requests for inclusion therein within 20 days after the receipt of the Company's notice, and the Company shall use its best efforts to cause such Piggyback Registration Statement to be declared effective by the SEC, so as to permit the public resale by the requesting Holders of their Warrant Stock pursuant thereto, at the Company's sole cost and expense and at no cost or expense to the requesting Holder (other than any underwriting or other commissions, discounts or fees of any counsel or advisor to the Holder which shall be payable by the Holder). The Company shall not be required to include the Warrant Stock in more than one registration statement filed with the SEC.

11. Adjustments to Warrant Stock and Minimum Payment Option Amount Upon Payment Default under the Loan Agreement. Upon the occurrence of an Event of Default (defined in the Loan Agreement) under section 6(a) of the Loan Agreement and such Event of Default continues (a) for more than ten (10) days past the due date therefor, then, in such event, (i) the number of Warrant Stock shares issuable hereunder to the Holder shall be increased by 25% and (ii) the Minimum Payment Option amount shall be increased by 25% and (b) for more than ninety (90) days past the due date therefor (or an additional Event of Default under section 6(a) of the Loan Agreement occurs thereafter, regardless of any cure of any previous Event of Default), then, in such event, (i) the number of Warrant Stock shares issuable hereunder to the Holder shall be increased by 200% and (ii) the Minimum Payment Option amount shall be increased by 200%.

12. Redemption.

(a) Election by Holder. At any time after the earlier to occur of (x) March 31, 2009 and (y) a Company Sale, the Holder may, by written notice to the Company (a "Redemption Request") but no more than once per calendar year, request that the Company redeem all or some portion of the Warrants. The Company shall complete such redemption, by payment to the Holder, at the Redemption Price (as defined below), against delivery by the Holder of this Warrant, within 30 days after the Redemption Request, if (A) below, or in four (4) equal payments, the first within 30 days after the Redemption Request and the remaining three (3) each to occur ninety (90) days after the previous payment, if (B) below. The "Redemption Price" shall be equal to the greater of (A) the Minimum Payment Option Amount or (B) (i) the difference between (y) the fair market value (determined as the greater of (1) the purchase price (adjusted by the level of long-term debt as reported on the most recent month's balance sheet in the event of an asset sale) to paid by the purchasers in the pending Company Sale and (2) the most recent appraisal, adjusted by the level of long-term debt as reported on the most recent month's balance sheet, pursuant to Section 8 hereof) of a share of Common Stock, and (z)

the Warrant Price, multiplied by (ii) the number of shares of Warrant Stock underlying the Warrants covered by the Redemption Request.

(b) Election by Company. At any time after the earlier to occur of (x) March 31, 2010 and (y) a Company Sale, the Company may, by written notice to the Holder (a "Call Notice"), require that the Holder permit the redemption of all or some portion of this Warrant, upon the terms and conditions set forth in this Section 12(b). The Company shall complete such redemption by payment to the Holder the Call Price (as defined below), against delivery by the Holder of this Warrant, within 30 days after the Call Notice if (A) below or in four (4) equal payments, the first within 30 days after receipt of the Call Notice, and the remaining three (3) each to occur ninety (90) days after the previous payment, if (B) below. The "Call Price" shall be equal to the greater of (A) the Minimum Payment Option Amount or (B) (i) the difference between (y) the fair market value (determined as the greater of (1) the purchase price (adjusted by the level of long-term debt as reported on the most recent month's balance sheet in the event of an asset sale) to be paid by the purchasers in the pending Company Sale and (2) the most recent appraisal, adjusted by the level of long-term debt as reported on the most recent month's balance sheet, pursuant to Section 8 hereof) of a share of Common Stock, and (z) the Warrant Price, multiplied by (ii) the number of shares of Warrant Stock underlying the Warrants covered by the Call Notice.

13.   Transfer of Warrant. This Warrant may be transferred or assigned by the Holder hereof in whole or in part upon notice to the Company.

14.   Termination. This Warrant shall terminate on the Termination Date.

15.   Miscellaneous. This Warrant shall be governed by the laws of the State of Georgia, as such laws are applied to contracts to be entered into and performed entirely in Georgia. The headings in this Warrant are for purposes of convenience and reference only, and shall not be deemed to constitute a part hereof. Neither this Warrant nor any term hereof may be changed or waived orally, but only by an instrument in writing signed by the Company and the Holder of this Warrant. All notices and other communications from the Company to the Holder of this Warrant shall be delivered personally or mailed by first class mail, postage prepaid, to the address furnished to the Company in writing by the last Holder of this Warrant who shall have furnished an address to the Company in writing, and if mailed shall be deemed given three days after deposit in the United States mail.

*[signatures contained on the next page]*

8

IN WITNESS HEREOF, the Company has duly caused this Warrant to be signed in its name and on its behalf by its duly authorized officers as of the date hereof.

ISSUED:   March 26, 2007

Brandywine Health Services of Mississippi, Inc.
d/b/a Choctaw County Medical Center (and nursing home)

By: _____

Name: _____

Title: _____

ACKNOWLEDGED AND AGREED:

By: _____
        Donald R. Millard

        Warrant Holder

8

IN WITNESS HEREOF, the Company has duly caused this Warrant to be signed in its name and on its behalf by its duly authorized officers as of the date hereof.

ISSUED:   March 26, 2007

Brandywine Health Services of Mississippi, Inc.
d/b/a Choctaw County Medical Center (and nursing home)

By:_____

Name:_____

Title:_____

ACKNOWLEDGED AND AGREED:

By:_____
    Donald R. Millard

    Warrant Holder

THE SECURITIES EVIDENCED BY THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF SUCH SECURITIES REASONABLY SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

## WARRANT TO PURCHASE COMMON STOCK

1) <u>Number of Shares Subject to Warrant</u>. FOR VALUE RECEIVED, on and under the date hereof, and subject to the terms and conditions herein set forth, the Holder (as defined below) is entitled to purchase from BRANDYWINE HEALTH SERVICES OF MISSISSIPPI, INC. (d/b/a Choctaw County Medical Center and Nursing Home), a Mississippi corporation (the "Company"), at any time before March 26, 2012 (the "Termination Date"), 40 shares of the Company's common stock ("Common Stock") at a price per share equal to the Warrant Price (as defined below) subject to adjustments as described below, upon exercise of this Warrant pursuant to Section 7 hereof.

2) <u>Definitions</u>. As used in this Warrant, the following terms shall have the definitions ascribed to them below:

    (a) "Holder" shall mean the undersigned "Lender" party to the Loan Agreement between Company and Lender, among others (as amended, the "Loan Agreement"), the Term Note issued by the Company to Lender in connection therewith, and all other agreements, instruments and documents executed and delivered in connection therewith all dated on or about even date herewith (as amended from time to time, collectively, the "Loan Documents").

    (b) "Securities" shall mean shares of the Company's Common Stock.

    (c) "Shares Outstanding at Issuance" shall mean 1,000 (insert fully diluted outstanding as of date of issuance).

    (d) "Warrant Price" shall mean $0.01 per share of the Company's Common Stock.

    (e) "Warrant Stock" shall mean the Securities purchasable upon exercise of this Warrant or issuable upon exercise of this Warrant.

3) <u>Adjustments Upon Changes in Shares or Organizational Documents</u>. (a)    If all or any portion of this Warrant shall be exercised after any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional



shares for less than fair market value as determined under this Warrant, or other similar event, occurring after the date hereof, then Holder upon exercising this Warrant shall receive, for the aggregate purchase price paid upon such exercise, the aggregate number of Securities Holder would have received if this Warrant had been exercised immediately prior to such any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event. If any adjustment under this paragraph would create a fractional share of Common Stock or a right to acquire a fractional share of Common Stock, such fractional share shall be disregarded and the number of shares subject to this Warrant shall be the next higher number of shares, rounding all fractions upward. Whenever there shall be any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event pursuant to this paragraph, the Company shall forthwith notify the Holder of this Warrant of such stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.

(b)     If all or any portion of this Warrant shall be exercised after any merger, consolidation, exchange of shares, separation, reorganization or liquidation of the Company, or other similar event, occurring after the date hereof, as a result of which shares of Common Stock shall be changed into the same or a different number of shares of the same or another class or classes of securities of the Company or another entity (excluding conversion of the Company to an S corporation under the federal tax code), or the holders of Common Stock are entitled to receive cash or other property, then the Holder exercising this Warrant shall receive, for the aggregate price paid upon such exercise, the aggregate number and class of shares, cash or other property which such Holder would have received if this Warrant had been exercised immediately prior to such merger, consolidation, exchange of shares, separation, reorganization or liquidation, or other similar event. If any adjustment under this paragraph would create a fractional share of Common Stock or a right to acquire a fractional share of Common Stock, such fractional share shall be disregarded and the number of shares subject to this Warrant shall be the next higher number of shares, rounding all fractions upward. Whenever there shall be an adjustment pursuant to this paragraph, the Company shall forthwith notify the Holder of this Warrant of such adjustment, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.

(c)     The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed

hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against impairment.

4) <u>No Stockholder Rights</u>. This Warrant, by itself, as distinguished from any shares purchased hereunder, shall not entitle its Holder to any of the rights of a stockholder of the Company.

5) <u>Representations and Covenants of the Company</u>.

    (a) <u>Reservation of Stock</u>. On and after the date hereof, the Company will reserve from its authorized and unissued Securities a sufficient number of shares to provide for the issuance of Warrant Stock upon the exercise or conversion of this Warrant. Issuance of this Warrant shall constitute full authority to the Company's officers who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Warrant Stock issuable upon the exercise or conversion of this Warrant.

    (b) <u>Issuance of Shares</u>. The Company covenants that the Warrant Stock, when issued pursuant to the exercise of this Warrant, will be duly and validly issued, fully paid and nonassessable and free from all taxes, liens, and charges with the respect to the issuance thereof.

    (c) <u>Notice</u>. The Company agrees to notify the Holder of this Warrant in writing at least fifteen (15) days prior to the closing of (any of the following items in this paragraph (c) below are referred to herein as a "Company Sale"): (i) a sale or transfer of the Company or all or substantially all of the Company's assets, (ii) a merger, consolidation or other transaction or series of related transactions, resulting in the exchange of the outstanding shares of the Company's capital stock such that the stockholders of the Company prior to such transaction own, directly or indirectly, less than 50% of the voting power of the surviving entity, or (iii) the issuance and sale of shares of Common Stock of the Company in a public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Act").

    (d) <u>Loss of Warrant</u>. Upon receipt of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant, and (in the case of loss, theft or destruction), of indemnification satisfactory to the Company, and upon surrender and cancellation of this Warrant, if mutilated, the Company shall execute and deliver to Holder a new Warrant of like tenor and date.

    (e) <u>Certificates for Shares</u>. Upon the exercise of the purchase rights evidenced by this Warrant, one or more certificates for the number of Securities so purchased shall be issued as soon as practicable thereafter, and in any event within thirty (30) days of the delivery of the Holder's notice of exercise hereunder ("Notice of Exercise").

6) Representations of the Holder. The Holder hereby represents and warrants that:

(a) Purchase Entirely for Own Account. This Warrant and the Securities issuable upon the conversion of this Warrant to be received by the Holder will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and the Holder has not present intention of selling, granting any participation in, or otherwise distributing the same. The Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or to any third person, with respect to the Warrant or any of the Securities issuable upon the conversion of the Warrant.

(b) Investment Experience. The Holder is an "accredited" investor under all applicable laws and invests in securities of companies in the development stage and acknowledges that is has the capacity to protect its own interests, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in this Warrant and the Securities issuable upon the conversion of this Warrant. If other than an individual, the Holder also represents it has not been organized for the purpose of acquiring this Warrant or the Securities issuable upon the conversion of this Warrant.

(c) Restricted Securities. The Holder understands that this Warrant and the Securities issuable upon the conversion of this Warrant are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Act, only in certain limited circumstances. The Holder is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

7. Exercise of Warrant. This Warrant may be exercised in whole or in part by the Holder, at any time and from time to time after the date hereof and prior to the Termination Date, by the surrender of this Warrant, together with the Notice of Exercise, duly completed and executed at the principal office of the Company, specifying the portion of the Warrant to be exercised and accompanied by payment in full of the Warrant Price in cash or by check with respect to the shares of the Warrant Stock being purchased. This Warrant shall be deemed to have been exercised immediately prior to the close of business on the date of its surrender for exercise as provided above, and the person entitled to receive the shares of Warrant Stock issuable upon such exercise shall be treated for all purposes as the Holder of such shares of record as of the close of business on such date. As promptly as practicable after such date, the Company shall issue and deliver to the person or persons entitled to receive the same a certificate or certificates for the

number of full shares of Warrant Stock issuable upon such exercise. If the Warrant shall be exercised for less than the total number of shares of Warrant Stock then issuable upon exercise, promptly after surrender of the Warrant upon such exercise, the Company will execute and deliver a new Warrant, dated the date hereof, evidencing the right of the Holder to the balance of the Warrant Stock purchasable hereunder upon the same terms and conditions set forth herein.

8. Valuation. For purposes of this Section 8, the fair market value of one share of Common Stock as of a particular date shall be determined as follows: if there is no active public market value, the value shall be determined by an appraisal conducted by a certified independent third-party appraiser, with such appraised value reduced by the Company's long-term debt as shown on its balance sheet as of the close of the most recent month, and divided by the fully-diluted number of Outstanding Shares of Common Stock to determine a per share value. The first such appraisal shall occur on or about March 31, 2009, and to the extent there are still Warrants outstanding, a second appraisal shall occur on or about March 31, 2010, and as necessary the third and final appraisal shall occur on or about March 31, 2011. Notwithstanding the foregoing, if, as of the date of determination of the fair market value hereunder, the Company has entered into a definitive agreement for a transaction described in Section 5(c)(i) or 5(c)(ii), the fair market value of one share of Common Stock shall be the fair market value of the shares of Common Stock ascribed to the Common Stock in such transaction.

9. Minimum Payment Option. In lieu of exercising this Warrant pursuant to Section 7, the Holder may elect (the "Minimum Payment Option") to receive a cash payment (the "Minimum Payment Option Amount"), and the Company agrees to pay an amount equal to Twenty Five Thousand Dollars ($25,000) for each Fifty Thousand Dollars ($50,000) (or portion thereof rounded upwards) such Holder has advanced to the Company pursuant to the Loan Documents. Such Minimum Payment Option may be exercised by Holder at any time (through and including the Termination Date) on and after the earlier to occur of (x) April 1, 2009 and (y) a Company Sale. In such an event, the Holder will provide written notice to the Company regarding election of the Minimum Payment Option, and will surrender the Warrant after Company's cash payment of the Minimum Payment Option Amount, which cash payment must be made no later than 30 days after receipt of notice.

10. Piggyback Rights. If at any time the Company proposes to prepare and file with the Securities and Exchange Commission (the "SEC") one of more registration statements or amendments, including post-effective amendments, or supplements thereto covering any equity or debt securities of the Company, or any such securities of the Company held by its stockholders, other than in connection with a merger or acquisition or pursuant to a registration statement on Form S-4 or Form S-8 or an successor form (for purposes of this Section 1, collectively, a "Piggyback Registration Statement"), the Company will give written notice of its intention to do so by registered or certified mail ("Notice"), at least twenty (20)

business days prior to the filing of each such Piggyback Registration Statement, to the Holder. The Company shall include all Warrant Stock in the proposed Piggyback Registration Statement with respect to which the Company has received written requests for inclusion therein within 20 days after the receipt of the Company's notice, and the Company shall use its best efforts to cause such Piggyback Registration Statement to be declared effective by the SEC, so as to permit the public resale by the requesting Holders of their Warrant Stock pursuant thereto, at the Company's sole cost and expense and at no cost or expense to the requesting Holder (other than any underwriting or other commissions, discounts or fees of any counsel or advisor to the Holder which shall be payable by the Holder). The Company shall not be required to include the Warrant Stock in more than one registration statement filed with the SEC.

11.  Adjustments to Warrant Stock and Minimum Payment Option Amount Upon Payment Default under the Loan Agreement. Upon the occurrence of an Event of Default (defined in the Loan Agreement) under section 6(a) of the Loan Agreement and such Event of Default continues (a) for more than ten (10) days past the due date therefor, then, in such event, (i) the number of Warrant Stock shares issuable hereunder to the Holder shall be increased by 25% and (ii) the Minimum Payment Option amount shall be increased by 25% and (b) for more than ninety (90) days past the due date therefor (or an additional Event of Default under section 6(a) of the Loan Agreement occurs thereafter, regardless of any cure of any previous Event of Default), then, in such event, (i) the number of Warrant Stock shares issuable hereunder to the Holder shall be increased by 200% and (ii) the Minimum Payment Option amount shall be increased by 200%.

12.  Redemption.

(a)  Election by Holder. At any time after the earlier to occur of (x) March 31, 2009 and (y) a Company Sale, the Holder may, by written notice to the Company (a "Redemption Request") but no more than once per calendar year, request that the Company redeem all or some portion of the Warrants. The Company shall complete such redemption, by payment to the Holder, at the Redemption Price (as defined below), against delivery by the Holder of this Warrant, within 30 days after the Redemption Request, if (A) below, or in four (4) equal payments, the first within 30 days after the Redemption Request and the remaining three (3) each to occur ninety (90) days after the previous payment, if (B) below. The "Redemption Price" shall be equal to the greater of (A) the Minimum Payment Option Amount or (B) (i) the difference between (y) the fair market value (determined as the greater of (1) the purchase price (adjusted by the level of long-term debt as reported on the most recent month's balance sheet in the event of an asset sale) to paid by the purchasers in the pending Company Sale and (2) the most recent appraisal, adjusted by the level of long-term debt as reported on the most recent month's balance sheet, pursuant to Section 8 hereof) of a share of Common Stock, and (z)

the Warrant Price, multiplied by (ii) the number of shares of Warrant Stock underlying the Warrants covered by the Redemption Request.

(b) Election by Company. At any time after the earlier to occur of (x) March 31, 2010 and (y) a Company Sale, the Company may, by written notice to the Holder (a "Call Notice"), require that the Holder permit the redemption of all or some portion of this Warrant, upon the terms and conditions set forth in this Section 12(b). The Company shall complete such redemption by payment to the Holder the Call Price (as defined below), against delivery by the Holder of this Warrant, within 30 days after the Call Notice if (A) below or in four (4) equal payments, the first within 30 days after receipt of the Call Notice, and the remaining three (3) each to occur ninety (90) days after the previous payment, if (B) below. The "Call Price" shall be equal to the greater of (A) the Minimum Payment Option Amount or (B) (i) the difference between (y) the fair market value (determined as the greater of (1) the purchase price (adjusted by the level of long-term debt as reported on the most recent month's balance sheet in the event of an asset sale) to be paid by the purchasers in the pending Company Sale and (2) the most recent appraisal, adjusted by the level of long-term debt as reported on the most recent month's balance sheet, pursuant to Section 8 hereof) of a share of Common Stock, and (z) the Warrant Price, multiplied by (ii) the number of shares of Warrant Stock underlying the Warrants covered by the Call Notice.

13. Transfer of Warrant. This Warrant may be transferred or assigned by the Holder hereof in whole or in part upon notice to the Company.

14. Termination. This Warrant shall terminate on the Termination Date.

15. Miscellaneous. This Warrant shall be governed by the laws of the State of Georgia, as such laws are applied to contracts to be entered into and performed entirely in Georgia. The headings in this Warrant are for purposes of convenience and reference only, and shall not be deemed to constitute a part hereof. Neither this Warrant nor any term hereof may be changed or waived orally, but only by an instrument in writing signed by the Company and the Holder of this Warrant. All notices and other communications from the Company to the Holder of this Warrant shall be delivered personally or mailed by first class mail, postage prepaid, to the address furnished to the Company in writing by the last Holder of this Warrant who shall have furnished an address to the Company in writing, and if mailed shall be deemed given three days after deposit in the United States mail.

*[signatures contained on the next page]*

8

IN WITNESS HEREOF, the Company has duly caused this Warrant to be signed in its name and on its behalf by its duly authorized officers as of the date hereof.

ISSUED:    March 26, 2007

Brandywine Health Services of Mississippi, Inc.
d/b/a Choctaw County Medical Center (and nursing home)

By: _Jeffrey A. Morse_____

Name: _Jeffrey A. Morse_____

Title: _President_____

ACKNOWLEDGED AND AGREED:

By:_____
        Hoppy Enterprises, LLC

        Warrant Holder

THE SECURITIES EVIDENCED BY THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF SUCH SECURITIES REASONABLY SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

## WARRANT TO PURCHASE COMMON STOCK

1) <u>Number of Shares Subject to Warrant</u>. FOR VALUE RECEIVED, on and under the date hereof, and subject to the terms and conditions herein set forth, the Holder (as defined below) is entitled to purchase from BRANDYWINE HEALTH SERVICES OF MISSISSIPPI, INC. (d/b/a Choctaw County Medical Center and Nursing Home), a Mississippi corporation (the "Company"), at any time before March 26, 2012 (the "Termination Date"), 20 shares of the Company's common stock ("Common Stock") at a price per share equal to the Warrant Price (as defined below) subject to adjustments as described below, upon exercise of this Warrant pursuant to Section 7 hereof.

2) <u>Definitions</u>. As used in this Warrant, the following terms shall have the definitions ascribed to them below:

    (a) "Holder" shall mean the undersigned "Lender" party to the Loan Agreement between Company and Lender, among others (as amended, the "Loan Agreement"), the Term Note issued by the Company to Lender in connection therewith, and all other agreements, instruments and documents executed and delivered in connection therewith all dated on or about even date herewith (as amended from time to time, collectively, the "Loan Documents").

    (b) "Securities" shall mean shares of the Company's Common Stock.

    (c) "Shares Outstanding at Issuance" shall mean 1,000 (insert fully diluted outstanding as of date of issuance).

    (d) "Warrant Price" shall mean $0.01 per share of the Company's Common Stock.

    (e) "Warrant Stock" shall mean the Securities purchasable upon exercise of this Warrant or issuable upon exercise of this Warrant.

3) <u>Adjustments Upon Changes in Shares or Organizational Documents</u>. (a)   If all or any portion of this Warrant shall be exercised after any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional



shares for less than fair market value as determined under this Warrant, or other similar event, occurring after the date hereof, then Holder upon exercising this Warrant shall receive, for the aggregate purchase price paid upon such exercise, the aggregate number of Securities Holder would have received if this Warrant had been exercised immediately prior to such any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event. If any adjustment under this paragraph would create a fractional share of Common Stock or a right to acquire a fractional share of Common Stock, such fractional share shall be disregarded and the number of shares subject to this Warrant shall be the next higher number of shares, rounding all fractions upward. Whenever there shall be any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event pursuant to this paragraph, the Company shall forthwith notify the Holder of this Warrant of such stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.

(b)     If all or any portion of this Warrant shall be exercised after any merger, consolidation, exchange of shares, separation, reorganization or liquidation of the Company, or other similar event, occurring after the date hereof, as a result of which shares of Common Stock shall be changed into the same or a different number of shares of the same or another class or classes of securities of the Company or another entity (excluding conversion of the Company to an S corporation under the federal tax code), or the holders of Common Stock are entitled to receive cash or other property, then the Holder exercising this Warrant shall receive, for the aggregate price paid upon such exercise, the aggregate number and class of shares, cash or other property which such Holder would have received if this Warrant had been exercised immediately prior to such merger, consolidation, exchange of shares, separation, reorganization or liquidation, or other similar event. If any adjustment under this paragraph would create a fractional share of Common Stock or a right to acquire a fractional share of Common Stock, such fractional share shall be disregarded and the number of shares subject to this Warrant shall be the next higher number of shares, rounding all fractions upward. Whenever there shall be an adjustment pursuant to this paragraph, the Company shall forthwith notify the Holder of this Warrant of such adjustment, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.

(c)     The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed

hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against impairment.

4) No Stockholder Rights. This Warrant, by itself, as distinguished from any shares purchased hereunder, shall not entitle its Holder to any of the rights of a stockholder of the Company.

5) Representations and Covenants of the Company.

      (a) Reservation of Stock. On and after the date hereof, the Company will reserve from its authorized and unissued Securities a sufficient number of shares to provide for the issuance of Warrant Stock upon the exercise or conversion of this Warrant. Issuance of this Warrant shall constitute full authority to the Company's officers who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Warrant Stock issuable upon the exercise or conversion of this Warrant.

      (b) Issuance of Shares. The Company covenants that the Warrant Stock, when issued pursuant to the exercise of this Warrant, will be duly and validly issued, fully paid and nonassessable and free from all taxes, liens, and charges with the respect to the issuance thereof.

      (c) Notice. The Company agrees to notify the Holder of this Warrant in writing at least fifteen (15) days prior to the closing of (any of the following items in this paragraph (c) below are referred to herein as a "Company Sale"): (i) a sale or transfer of the Company or all or substantially all of the Company's assets, (ii) a merger, consolidation or other transaction or series of related transactions, resulting in the exchange of the outstanding shares of the Company's capital stock such that the stockholders of the Company prior to such transaction own, directly or indirectly, less than 50% of the voting power of the surviving entity, or (iii) the issuance and sale of shares of Common Stock of the Company in a public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Act").

      (d) Loss of Warrant. Upon receipt of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant, and (in the case of loss, theft or destruction), of indemnification satisfactory to the Company, and upon surrender and cancellation of this Warrant, if mutilated, the Company shall execute and deliver to Holder a new Warrant of like tenor and date.

      (e) Certificates for Shares. Upon the exercise of the purchase rights evidenced by this Warrant, one or more certificates for the number of Securities so purchased shall be issued as soon as practicable thereafter, and in any event within thirty (30) days of the delivery of the Holder's notice of exercise hereunder ("Notice of Exercise").

6) Representations of the Holder. The Holder hereby represents and warrants that:

(a) Purchase Entirely for Own Account. This Warrant and the Securities issuable upon the conversion of this Warrant to be received by the Holder will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and the Holder has not present intention of selling, granting any participation in, or otherwise distributing the same. The Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or to any third person, with respect to the Warrant or any of the Securities issuable upon the conversion of the Warrant.

(b) Investment Experience. The Holder is an "accredited" investor under all applicable laws and invests in securities of companies in the development stage and acknowledges that is has the capacity to protect its own interests, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in this Warrant and the Securities issuable upon the conversion of this Warrant. If other than an individual, the Holder also represents it has not been organized for the purpose of acquiring this Warrant or the Securities issuable upon the conversion of this Warrant.

(c) Restricted Securities. The Holder understands that this Warrant and the Securities issuable upon the conversion of this Warrant are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Act, only in certain limited circumstances. The Holder is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

7. Exercise of Warrant. This Warrant may be exercised in whole or in part by the Holder, at any time and from time to time after the date hereof and prior to the Termination Date, by the surrender of this Warrant, together with the Notice of Exercise, duly completed and executed at the principal office of the Company, specifying the portion of the Warrant to be exercised and accompanied by payment in full of the Warrant Price in cash or by check with respect to the shares of the Warrant Stock being purchased. This Warrant shall be deemed to have been exercised immediately prior to the close of business on the date of its surrender for exercise as provided above, and the person entitled to receive the shares of Warrant Stock issuable upon such exercise shall be treated for all purposes as the Holder of such shares of record as of the close of business on such date. As promptly as practicable after such date, the Company shall issue and deliver to the person or persons entitled to receive the same a certificate or certificates for the

number of full shares of Warrant Stock issuable upon such exercise.  If the Warrant shall be exercised for less than the total number of shares of Warrant Stock then issuable upon exercise, promptly after surrender of the Warrant upon such exercise, the Company will execute and deliver a new Warrant, dated the date hereof, evidencing the right of the Holder to the balance of the Warrant Stock purchasable hereunder upon the same terms and conditions set forth herein.

8.   Valuation. For purposes of this Section 8, the fair market value of one share of Common Stock as of a particular date shall be determined as follows: if there is no active public market value, the value shall be determined by an appraisal conducted by a certified independent third-party appraiser, with such appraised value reduced by the Company's long-term debt as shown on its balance sheet as of the close of the most recent month, and divided by the fully-diluted number of Outstanding Shares of Common Stock to determine a per share value. The first such appraisal shall occur on or about March 31, 2009, and to the extent there are still Warrants outstanding, a second appraisal shall occur on or about March 31, 2010, and as necessary the third and final appraisal shall occur on or about March 31, 2011. Notwithstanding the foregoing, if, as of the date of determination of the fair market value hereunder, the Company has entered into a definitive agreement for a transaction described in Section 5(c)(i) or 5(c)(ii), the fair market value of one share of Common Stock shall be the fair market value of the shares of Common Stock ascribed to the Common Stock in such transaction.

9.   Minimum Payment Option. In lieu of exercising this Warrant pursuant to Section 7, the Holder may elect (the "Minimum Payment Option") to receive a cash payment (the "Minimum Payment Option Amount"), and the Company agrees to pay an amount equal to Twenty Five Thousand Dollars ($25,000) for each Fifty Thousand Dollars ($50,000) (or portion thereof rounded upwards) such Holder has advanced to the Company pursuant to the Loan Documents.  Such Minimum Payment Option may be exercised by Holder at any time (through and including the Termination Date) on and after the earlier to occur of (x) April 1, 2009 and (y) a Company Sale. In such an event, the Holder will provide written notice to the Company regarding election of the Minimum Payment Option, and will surrender the Warrant after Company's cash payment of the Minimum Payment Option Amount, which cash payment must be made no later than 30 days after receipt of notice.

10.   Piggyback Rights. If at any time the Company proposes to prepare and file with the Securities and Exchange Commission (the "SEC") one or more registration statements or amendments, including post-effective amendments, or supplements thereto covering any equity or debt securities of the Company, or any such securities of the Company held by its stockholders, other than in connection with a merger or acquisition or pursuant to a registration statement on Form S-4 or Form S-8 or an successor form (for purposes of this Section 1, collectively, a "Piggyback Registration Statement"), the Company will give written notice of its intention to do so by registered or certified mail ("Notice"), at least twenty (20)

business days prior to the filing of each such Piggyback Registration Statement, to the Holder. The Company shall include all Warrant Stock in the proposed Piggyback Registration Statement with respect to which the Company has received written requests for inclusion therein within 20 days after the receipt of the Company's notice, and the Company shall use its best efforts to cause such Piggyback Registration Statement to be declared effective by the SEC, so as to permit the public resale by the requesting Holders of their Warrant Stock pursuant thereto, at the Company's sole cost and expense and at no cost or expense to the requesting Holder (other than any underwriting or other commissions, discounts or fees of any counsel or advisor to the Holder which shall be payable by the Holder). The Company shall not be required to include the Warrant Stock in more than one registration statement filed with the SEC.

11. Adjustments to Warrant Stock and Minimum Payment Option Amount Upon Payment Default under the Loan Agreement. Upon the occurrence of an Event of Default (defined in the Loan Agreement) under section 6(a) of the Loan Agreement and such Event of Default continues (a) for more than ten (10) days past the due date therefor, then, in such event, (i) the number of Warrant Stock shares issuable hereunder to the Holder shall be increased by 25% and (ii) the Minimum Payment Option amount shall be increased by 25% and (b) for more than ninety (90) days past the due date therefor (or an additional Event of Default under section 6(a) of the Loan Agreement occurs thereafter, regardless of any cure of any previous Event of Default), then, in such event, (i) the number of Warrant Stock shares issuable hereunder to the Holder shall be increased by 200% and (ii) the Minimum Payment Option amount shall be increased by 200%.

12. Redemption.

    (a) Election by Holder. At any time after the earlier to occur of (x) March 31, 2009 and (y) a Company Sale, the Holder may, by written notice to the Company (a "Redemption Request") but no more than once per calendar year, request that the Company redeem all or some portion of the Warrants. The Company shall complete such redemption, by payment to the Holder, at the Redemption Price (as defined below), against delivery by the Holder of this Warrant, within 30 days after the Redemption Request, if (A) below, or in four (4) equal payments, the first within 30 days after the Redemption Request and the remaining three (3) each to occur ninety (90) days after the previous payment, if (B) below. The "Redemption Price" shall be equal to the greater of (A) the Minimum Payment Option Amount or (B) (i) the difference between (y) the fair market value (determined as the greater of (1) the purchase price (adjusted by the level of long-term debt as reported on the most recent month's balance sheet in the event of an asset sale) to paid by the purchasers in the pending Company Sale and (2) the most recent appraisal, adjusted by the level of long-term debt as reported on the most recent month's balance sheet, pursuant to Section 8 hereof) of a share of Common Stock, and (z)

the Warrant Price, multiplied by (ii) the number of shares of Warrant Stock underlying the Warrants covered by the Redemption Request.

(b) Election by Company. At any time after the earlier to occur of (x) March 31, 2010 and (y) a Company Sale, the Company may, by written notice to the Holder (a "Call Notice"), require that the Holder permit the redemption of all or some portion of this Warrant, upon the terms and conditions set forth in this Section 12(b). The Company shall complete such redemption by payment to the Holder the Call Price (as defined below), against delivery by the Holder of this Warrant, within 30 days after the Call Notice if (A) below or in four (4) equal payments, the first within 30 days after receipt of the Call Notice, and the remaining three (3) each to occur ninety (90) days after the previous payment, if (B) below. The "Call Price" shall be equal to the greater of (A) the Minimum Payment Option Amount or (B) (i) the difference between (y) the fair market value (determined as the greater of (1) the purchase price (adjusted by the level of long-term debt as reported on the most recent month's balance sheet in the event of an asset sale) to be paid by the purchasers in the pending Company Sale and (2) the most recent appraisal, adjusted by the level of long-term debt as reported on the most recent month's balance sheet, pursuant to Section 8 hereof) of a share of Common Stock, and (z) the Warrant Price, multiplied by (ii) the number of shares of Warrant Stock underlying the Warrants covered by the Call Notice.

13. Transfer of Warrant. This Warrant may be transferred or assigned by the Holder hereof in whole or in part upon notice to the Company.

14. Termination. This Warrant shall terminate on the Termination Date.

15. Miscellaneous. This Warrant shall be governed by the laws of the State of Georgia, as such laws are applied to contracts to be entered into and performed entirely in Georgia. The headings in this Warrant are for purposes of convenience and reference only, and shall not be deemed to constitute a part hereof. Neither this Warrant nor any term hereof may be changed or waived orally, but only by an instrument in writing signed by the Company and the Holder of this Warrant. All notices and other communications from the Company to the Holder of this Warrant shall be delivered personally or mailed by first class mail, postage prepaid, to the address furnished to the Company in writing by the last Holder of this Warrant who shall have furnished an address to the Company in writing, and if mailed shall be deemed given three days after deposit in the United States mail.

*[signatures contained on the next page]*

8

IN WITNESS HEREOF, the Company has duly caused this Warrant to be signed in its name and on its behalf by its duly authorized officers as of the date hereof.

ISSUED:   March 26, 2007

Brandywine Health Services of Mississippi, Inc.
d/b/a Choctaw County Medical Center (and nursing home)

By: _Jeffrey A. Morse_

Name: _Jeffrey A. Morse_

Title: _President._

ACKNOWLEDGED AND AGREED:

By:_____
    Marshall B. Hunt

    Warrant Holder

8

IN WITNESS HEREOF, the Company has duly caused this Warrant to be signed in its name and on its behalf by its duly authorized officers as of the date hereof.

ISSUED:   March 26, 2007

Brandywine Health Services of Mississippi, Inc.
d/b/a Choctaw County Medical Center (and nursing home)

By:_____

Name:_____

Title:_____

ACKNOWLEDGED AND AGREED:

By:_____
        Marshall B. Hunt

        Warrant Holder

THE SECURITIES EVIDENCED BY THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF SUCH SECURITIES REASONABLY SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

## WARRANT TO PURCHASE COMMON STOCK

1) <u>Number of Shares Subject to Warrant</u>. FOR VALUE RECEIVED, on and under the date hereof, and subject to the terms and conditions herein set forth, the Holder (as defined below) is entitled to purchase from BRANDYWINE HEALTH SERVICES OF MISSISSIPPI, INC. (d/b/a Choctaw County Medical Center and Nursing Home), a Mississippi corporation (the "Company"), at any time before March 26, 2012 (the "Termination Date"), 15 shares of the Company's common stock ("Common Stock") at a price per share equal to the Warrant Price (as defined below) subject to adjustments as described below, upon exercise of this Warrant pursuant to Section 7 hereof.

2) <u>Definitions</u>. As used in this Warrant, the following terms shall have the definitions ascribed to them below:

      (a) "Holder" shall mean the undersigned "Lender" party to the Loan Agreement between Company and Lender, among others (as amended, the "Loan Agreement"), the Term Note issued by the Company to Lender in connection therewith, and all other agreements, instruments and documents executed and delivered in connection therewith all dated on or about even date herewith (as amended from time to time, collectively, the "Loan Documents").

      (b) "Securities" shall mean shares of the Company's Common Stock.

      (c) "Shares Outstanding at Issuance" shall mean 1,000 (insert fully diluted outstanding as of date of issuance).

      (d) "Warrant Price" shall mean $0.01 per share of the Company's Common Stock.

      (e) "Warrant Stock" shall mean the Securities purchasable upon exercise of this Warrant or issuable upon exercise of this Warrant.

3) <u>Adjustments Upon Changes in Shares or Organizational Documents</u>. (a) If all or any portion of this Warrant shall be exercised after any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional



shares for less than fair market value as determined under this Warrant, or other similar event, occurring after the date hereof, then Holder upon exercising this Warrant shall receive, for the aggregate purchase price paid upon such exercise, the aggregate number of Securities Holder would have received if this Warrant had been exercised immediately prior to such any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event. If any adjustment under this paragraph would create a fractional share of Common Stock or a right to acquire a fractional share of Common Stock, such fractional share shall be disregarded and the number of shares subject to this Warrant shall be the next higher number of shares, rounding all fractions upward. Whenever there shall be any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event pursuant to this paragraph, the Company shall forthwith notify the Holder of this Warrant of such stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.

(b)     If all or any portion of this Warrant shall be exercised after any merger, consolidation, exchange of shares, separation, reorganization or liquidation of the Company, or other similar event, occurring after the date hereof, as a result of which shares of Common Stock shall be changed into the same or a different number of shares of the same or another class or classes of securities of the Company or another entity (excluding conversion of the Company to an S corporation under the federal tax code), or the holders of Common Stock are entitled to receive cash or other property, then the Holder exercising this Warrant shall receive, for the aggregate price paid upon such exercise, the aggregate number and class of shares, cash or other property which such Holder would have received if this Warrant had been exercised immediately prior to such merger, consolidation, exchange of shares, separation, reorganization or liquidation, or other similar event. If any adjustment under this paragraph would create a fractional share of Common Stock or a right to acquire a fractional share of Common Stock, such fractional share shall be disregarded and the number of shares subject to this Warrant shall be the next higher number of shares, rounding all fractions upward. Whenever there shall be an adjustment pursuant to this paragraph, the Company shall forthwith notify the Holder of this Warrant of such adjustment, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.

(c)     The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed

hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against impairment.

4) No Stockholder Rights. This Warrant, by itself, as distinguished from any shares purchased hereunder, shall not entitle its Holder to any of the rights of a stockholder of the Company.

5) Representations and Covenants of the Company.

(a) Reservation of Stock. On and after the date hereof, the Company will reserve from its authorized and unissued Securities a sufficient number of shares to provide for the issuance of Warrant Stock upon the exercise or conversion of this Warrant. Issuance of this Warrant shall constitute full authority to the Company's officers who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Warrant Stock issuable upon the exercise or conversion of this Warrant.

(b) Issuance of Shares. The Company covenants that the Warrant Stock, when issued pursuant to the exercise of this Warrant, will be duly and validly issued, fully paid and nonassessable and free from all taxes, liens, and charges with the respect to the issuance thereof.

(c) Notice. The Company agrees to notify the Holder of this Warrant in writing at least fifteen (15) days prior to the closing of (any of the following items in this paragraph (c) below are referred to herein as a "Company Sale"): (i) a sale or transfer of the Company or all or substantially all of the Company's assets, (ii) a merger, consolidation or other transaction or series of related transactions, resulting in the exchange of the outstanding shares of the Company's capital stock such that the stockholders of the Company prior to such transaction own, directly or indirectly, less than 50% of the voting power of the surviving entity, or (iii) the issuance and sale of shares of Common Stock of the Company in a public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Act").

(d) Loss of Warrant. Upon receipt of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant, and (in the case of loss, theft or destruction), of indemnification satisfactory to the Company, and upon surrender and cancellation of this Warrant, if mutilated, the Company shall execute and deliver to Holder a new Warrant of like tenor and date.

(e) Certificates for Shares. Upon the exercise of the purchase rights evidenced by this Warrant, one or more certificates for the number of Securities so purchased shall be issued as soon as practicable thereafter, and in any event within thirty (30) days of the delivery of the Holder's notice of exercise hereunder ("Notice of Exercise").

6) <u>Representations of the Holder.</u> The Holder hereby represents and warrants that:

(a) <u>Purchase Entirely for Own Account.</u> This Warrant and the Securities issuable upon the conversion of this Warrant to be received by the Holder will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and the Holder has not present intention of selling, granting any participation in, or otherwise distributing the same. The Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or to any third person, with respect to the Warrant or any of the Securities issuable upon the conversion of the Warrant.

(b) <u>Investment Experience.</u> The Holder is an "accredited" investor under all applicable laws and invests in securities of companies in the development stage and acknowledges that is has the capacity to protect its own interests, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in this Warrant and the Securities issuable upon the conversion of this Warrant. If other than an individual, the Holder also represents it has not been organized for the purpose of acquiring this Warrant or the Securities issuable upon the conversion of this Warrant.

(c) <u>Restricted Securities.</u> The Holder understands that this Warrant and the Securities issuable upon the conversion of this Warrant are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Act, only in certain limited circumstances. The Holder is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

7. <u>Exercise of Warrant.</u> This Warrant may be exercised in whole or in part by the Holder, at any time and from time to time after the date hereof and prior to the Termination Date, by the surrender of this Warrant, together with the Notice of Exercise, duly completed and executed at the principal office of the Company, specifying the portion of the Warrant to be exercised and accompanied by payment in full of the Warrant Price in cash or by check with respect to the shares of the Warrant Stock being purchased. This Warrant shall be deemed to have been exercised immediately prior to the close of business on the date of its surrender for exercise as provided above, and the person entitled to receive the shares of Warrant Stock issuable upon such exercise shall be treated for all purposes as the Holder of such shares of record as of the close of business on such date. As promptly as practicable after such date, the Company shall issue and deliver to the person or persons entitled to receive the same a certificate or certificates for the

number of full shares of Warrant Stock issuable upon such exercise. If the Warrant shall be exercised for less than the total number of shares of Warrant Stock then issuable upon exercise, promptly after surrender of the Warrant upon such exercise, the Company will execute and deliver a new Warrant, dated the date hereof, evidencing the right of the Holder to the balance of the Warrant Stock purchasable hereunder upon the same terms and conditions set forth herein.

8.    Valuation. For purposes of this Section 8, the fair market value of one share of Common Stock as of a particular date shall be determined as follows: if there is no active public market value, the value shall be determined by an appraisal conducted by a certified independent third-party appraiser, with such appraised value reduced by the Company's long-term debt as shown on its balance sheet as of the close of the most recent month, and divided by the fully-diluted number of Outstanding Shares of Common Stock to determine a per share value. The first such appraisal shall occur on or about March 31, 2009, and to the extent there are still Warrants outstanding, a second appraisal shall occur on or about March 31, 2010, and as necessary the third and final appraisal shall occur on or about March 31, 2011. Notwithstanding the foregoing, if, as of the date of determination of the fair market value hereunder, the Company has entered into a definitive agreement for a transaction described in Section 5(c)(i) or 5(c)(ii), the fair market value of one share of Common Stock shall be the fair market value of the shares of Common Stock ascribed to the Common Stock in such transaction.

9.    Minimum Payment Option. In lieu of exercising this Warrant pursuant to Section 7, the Holder may elect (the "Minimum Payment Option") to receive a cash payment (the "Minimum Payment Option Amount"), and the Company agrees to pay an amount equal to Twenty Five Thousand Dollars ($25,000) for each Fifty Thousand Dollars ($50,000) (or portion thereof rounded upwards) such Holder has advanced to the Company pursuant to the Loan Documents. Such Minimum Payment Option may be exercised by Holder at any time (through and including the Termination Date) on and after the earlier to occur of (x) April 1, 2009 and (y) a Company Sale. In such an event, the Holder will provide written notice to the Company regarding election of the Minimum Payment Option, and will surrender the Warrant after Company's cash payment of the Minimum Payment Option Amount, which cash payment must be made no later than 30 days after receipt of notice.

10.    Piggyback Rights. If at any time the Company proposes to prepare and file with the Securities and Exchange Commission (the "SEC") one of more registration statements or amendments, including post-effective amendments, or supplements thereto covering any equity or debt securities of the Company, or any such securities of the Company held by its stockholders, other than in connection with a merger or acquisition or pursuant to a registration statement on Form S-4 or Form S-8 or an successor form (for purposes of this Section 1, collectively, a "Piggyback Registration Statement"), the Company will give written notice of its intention to do so by registered or certified mail ("Notice"), at least twenty (20)

6

business days prior to the filing of each such Piggyback Registration Statement, to the Holder. The Company shall include all Warrant Stock in the proposed Piggyback Registration Statement with respect to which the Company has received written requests for inclusion therein within 20 days after the receipt of the Company's notice, and the Company shall use its best efforts to cause such Piggyback Registration Statement to be declared effective by the SEC, so as to permit the public resale by the requesting Holders of their Warrant Stock pursuant thereto, at the Company's sole cost and expense and at no cost or expense to the requesting Holder (other than any underwriting or other commissions, discounts or fees of any counsel or advisor to the Holder which shall be payable by the Holder). The Company shall not be required to include the Warrant Stock in more than one registration statement filed with the SEC.

11.  Adjustments to Warrant Stock and Minimum Payment Option Amount Upon Payment Default under the Loan Agreement. Upon the occurrence of an Event of Default (defined in the Loan Agreement) under section 6(a) of the Loan Agreement and such Event of Default continues (a) for more than ten (10) days past the due date therefor, then, in such event, (i) the number of Warrant Stock shares issuable hereunder to the Holder shall be increased by 25% and (ii) the Minimum Payment Option amount shall be increased by 25% and (b) for more than ninety (90) days past the due date therefor (or an additional Event of Default under section 6(a) of the Loan Agreement occurs thereafter, regardless of any cure of any previous Event of Default), then, in such event, (i) the number of Warrant Stock shares issuable hereunder to the Holder shall be increased by 200% and (ii) the Minimum Payment Option amount shall be increased by 200%.

12.  Redemption.

(a) Election by Holder. At any time after the earlier to occur of (x) March 31, 2009 and (y) a Company Sale, the Holder may, by written notice to the Company (a "Redemption Request") but no more than once per calendar year, request that the Company redeem all or some portion of the Warrants. The Company shall complete such redemption, by payment to the Holder, at the Redemption Price (as defined below), against delivery by the Holder of this Warrant, within 30 days after the Redemption Request, if (A) below, or in four (4) equal payments, the first within 30 days after the Redemption Request and the remaining three (3) each to occur ninety (90) days after the previous payment, if (B) below. The "Redemption Price" shall be equal to the greater of (A) the Minimum Payment Option Amount or (B) (i) the difference between (y) the fair market value (determined as the greater of (1) the purchase price (adjusted by the level of long-term debt as reported on the most recent month's balance sheet in the event of an asset sale) to paid by the purchasers in the pending Company Sale and (2) the most recent appraisal, adjusted by the level of long-term debt as reported on the most recent month's balance sheet, pursuant to Section 8 hereof) of a share of Common Stock, and (z)

the Warrant Price, multiplied by (ii) the number of shares of Warrant Stock underlying the Warrants covered by the Redemption Request.

(b) Election by Company. At any time after the earlier to occur of (x) March 31, 2010 and (y) a Company Sale, the Company may, by written notice to the Holder (a "Call Notice"), require that the Holder permit the redemption of all or some portion of this Warrant, upon the terms and conditions set forth in this Section 12(b). The Company shall complete such redemption by payment to the Holder the Call Price (as defined below), against delivery by the Holder of this Warrant, within 30 days after the Call Notice if (A) below or in four (4) equal payments, the first within 30 days after receipt of the Call Notice, and the remaining three (3) each to occur ninety (90) days after the previous payment, if (B) below. The "Call Price" shall be equal to the greater of (A) the Minimum Payment Option Amount or (B) (i) the difference between (y) the fair market value (determined as the greater of (1) the purchase price (adjusted by the level of long-term debt as reported on the most recent month's balance sheet in the event of an asset sale) to be paid by the purchasers in the pending Company Sale and (2) the most recent appraisal, adjusted by the level of long-term debt as reported on the most recent month's balance sheet, pursuant to Section 8 hereof) of a share of Common Stock, and (z) the Warrant Price, multiplied by (ii) the number of shares of Warrant Stock underlying the Warrants covered by the Call Notice.

13. Transfer of Warrant. This Warrant may be transferred or assigned by the Holder hereof in whole or in part upon notice to the Company.

14. Termination. This Warrant shall terminate on the Termination Date.

15. Miscellaneous. This Warrant shall be governed by the laws of the State of Georgia, as such laws are applied to contracts to be entered into and performed entirely in Georgia. The headings in this Warrant are for purposes of convenience and reference only, and shall not be deemed to constitute a part hereof. Neither this Warrant nor any term hereof may be changed or waived orally, but only by an instrument in writing signed by the Company and the Holder of this Warrant. All notices and other communications from the Company to the Holder of this Warrant shall be delivered personally or mailed by first class mail, postage prepaid, to the address furnished to the Company in writing by the last Holder of this Warrant who shall have furnished an address to the Company in writing, and if mailed shall be deemed given three days after deposit in the United States mail.

*[signatures contained on the next page]*

8

IN WITNESS HEREOF, the Company has duly caused this Warrant to be signed in its name and on its behalf by its duly authorized officers as of the date hereof.

ISSUED:   March 26, 2007

Brandywine Health Services of Mississippi, Inc.
d/b/a Choctaw County Medical Center (and nursing home)

By: _____

Name: _____

Title: _____

ACKNOWLEDGED AND AGREED:

By: _____
    Olin Garwood Lippincott

    Warrant Holder

230551 v3

THE SECURITIES EVIDENCED BY THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF SUCH SECURITIES REASONABLY SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

## WARRANT TO PURCHASE COMMON STOCK

1) Number of Shares Subject to Warrant. FOR VALUE RECEIVED, on and under the date hereof, and subject to the terms and conditions herein set forth, the Holder (as defined below) is entitled to purchase from BRANDYWINE HEALTH SERVICES OF MISSISSIPPI, INC. (d/b/a Choctaw County Medical Center and Nursing Home), a Mississippi corporation (the "Company"), at any time before March 26, 2012 (the "Termination Date"), 5 shares of the Company's common stock ("Common Stock") at a price per share equal to the Warrant Price (as defined below) subject to adjustments as described below, upon exercise of this Warrant pursuant to Section 7 hereof.

2) Definitions. As used in this Warrant, the following terms shall have the definitions ascribed to them below:

   (a) "Holder" shall mean the undersigned "Lender" party to the Loan Agreement between Company and Lender, among others (as amended, the "Loan Agreement"), the Term Note issued by the Company to Lender in connection therewith, and all other agreements, instruments and documents executed and delivered in connection therewith all dated on or about even date herewith (as amended from time to time, collectively, the "Loan Documents").

   (b) "Securities" shall mean shares of the Company's Common Stock.

   (c) "Shares Outstanding at Issuance" shall mean 1,000 (insert fully diluted outstanding as of date of issuance).

   (d) "Warrant Price" shall mean $0.01 per share of the Company's Common Stock.

   (e) "Warrant Stock" shall mean the Securities purchasable upon exercise of this Warrant or issuable upon exercise of this Warrant.

3) Adjustments Upon Changes in Shares or Organizational Documents. (a)    If all or any portion of this Warrant shall be exercised after any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional

230551 v3



2

shares for less than fair market value as determined under this Warrant, or other similar event, occurring after the date hereof, then Holder upon exercising this Warrant shall receive, for the aggregate purchase price paid upon such exercise, the aggregate number of Securities Holder would have received if this Warrant had been exercised immediately prior to such any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event. If any adjustment under this paragraph would create a fractional share of Common Stock or a right to acquire a fractional share of Common Stock, such fractional share shall be disregarded and the number of shares subject to this Warrant shall be the next higher number of shares, rounding all fractions upward. Whenever there shall be any stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event pursuant to this paragraph, the Company shall forthwith notify the Holder of this Warrant of such stock split, stock dividend, recapitalization, combination of shares of the Company, issuance of additional shares for less than fair market value as determined under this Warrant or other similar event, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.

(b) If all or any portion of this Warrant shall be exercised after any merger, consolidation, exchange of shares, separation, reorganization or liquidation of the Company, or other similar event, occurring after the date hereof, as a result of which shares of Common Stock shall be changed into the same or a different number of shares of the same or another class or classes of securities of the Company or another entity (excluding conversion of the Company to an S corporation under the federal tax code), or the holders of Common Stock are entitled to receive cash or other property, then the Holder exercising this Warrant shall receive, for the aggregate price paid upon such exercise, the aggregate number and class of shares, cash or other property which such Holder would have received if this Warrant had been exercised immediately prior to such merger, consolidation, exchange of shares, separation, reorganization or liquidation, or other similar event. If any adjustment under this paragraph would create a fractional share of Common Stock or a right to acquire a fractional share of Common Stock, such fractional share shall be disregarded and the number of shares subject to this Warrant shall be the next higher number of shares, rounding all fractions upward. Whenever there shall be an adjustment pursuant to this paragraph, the Company shall forthwith notify the Holder of this Warrant of such adjustment, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated.

(c) The Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed

hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder against impairment.

4) No Stockholder Rights. This Warrant, by itself, as distinguished from any shares purchased hereunder, shall not entitle its Holder to any of the rights of a stockholder of the Company.

5) Representations and Covenants of the Company.

    (a) Reservation of Stock. On and after the date hereof, the Company will reserve from its authorized and unissued Securities a sufficient number of shares to provide for the issuance of Warrant Stock upon the exercise or conversion of this Warrant. Issuance of this Warrant shall constitute full authority to the Company's officers who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Warrant Stock issuable upon the exercise or conversion of this Warrant.

    (b) Issuance of Shares. The Company covenants that the Warrant Stock, when issued pursuant to the exercise of this Warrant, will be duly and validly issued, fully paid and nonassessable and free from all taxes, liens, and charges with the respect to the issuance thereof.

    (c) Notice. The Company agrees to notify the Holder of this Warrant in writing at least fifteen (15) days prior to the closing of (any of the following items in this paragraph (c) below are referred to herein as a "Company Sale"): (i) a sale or transfer of the Company or all or substantially all of the Company's assets, (ii) a merger, consolidation or other transaction or series of related transactions, resulting in the exchange of the outstanding shares of the Company's capital stock such that the stockholders of the Company prior to such transaction own, directly or indirectly, less than 50% of the voting power of the surviving entity, or (iii) the issuance and sale of shares of Common Stock of the Company in a public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Act").

    (d) Loss of Warrant. Upon receipt of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant, and (in the case of loss, theft or destruction), of indemnification satisfactory to the Company, and upon surrender and cancellation of this Warrant, if mutilated, the Company shall execute and deliver to Holder a new Warrant of like tenor and date.

    (e) Certificates for Shares. Upon the exercise of the purchase rights evidenced by this Warrant, one or more certificates for the number of Securities so purchased shall be issued as soon as practicable thereafter, and in any event within thirty (30) days of the delivery of the Holder's notice of exercise hereunder ("Notice of Exercise").